**OLD BEN COAL COMPANY,
Petitioner,**

v.

**Elmer H. LUKER and the Director, Office of Workers' Compensation Programs, and United States Department of Labor, Respondents.**

No. 86–1420.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1987.

Decided Aug. 14, 1987.

As Amended Nov. 4, 1987.

Bronius K. Taoras, Old Ben Coal Co., Legal Dept., Cleveland, Ohio, for petitioner.

Edward D. Sieger, U.S. Dept. of Labor, Washington, D.C., for respondents.

Before WOOD, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

This is a petition for review of a final order of the Benefits Review Board (the "Board"), United States Department of Labor, awarding benefits under the Black Lung Benefits Act (the "Act"), 30 U.S.C. § 901 *et seq.* The Board affirmed the decision of the Administrative Law Judge (the "ALJ") awarding benefits to Elmer Luker. The Board also denied a motion of Old Ben Coal Company ("Old Ben") seeking dismissal as the operator responsible for paying Luker's benefit and a shift in responsibility for payment to the Black Lung Disability Trust Fund (the "Trust Fund"). Old Ben appeals the determination that benefits are payable and the denial of the motion to

transfer responsibility to the Trust Fund. We affirm the determination that Luker is entitled to benefits. We vacate the determination that liability does not transfer and remand the matter to the Board for a redetermination of transfer responsibility.

## I.

Elmer Luker began working for Old Ben as a coal miner in 1932, working as a truck driver, tractor driver, driller, shooter and stripper. His employment exposed him to substantial amounts of coal mine dust. Luker testified that as a truck driver he made from nine to twelve round trips a day from the mine to the tipple where the loaded truck was emptied, over haulage roads made of "gob" (refuse from the coal, consisting of coal and impurities, such as sulphur balls). Although Raymond Wools, an Old Ben manager, asserted that the "gob" had been replaced by crushed rock earlier than 1969 (the date claimed by Luker), Wools admitted that the roads presented a continuing dust problem requiring two water trucks to hose them down. Even after 1969 there was a serious dust problem on the roads.

At the tipple, where the coal was dropped considerable distances in unloading, more dust was generated, and continued to be generated even after a change which allowed the truck driver to move over the hopper while unloading. Dust was also generated by loading coal onto the trucks and by blasting to remove coal. Luker drove trucks that may not have had windows or trucks that had no air conditioning so the windows were kept open. At the end of the work day his face and other exposed parts of his body were occasionally "as black as the coal."

Luker testified that he began seeing a doctor about his lungs in 1961 or 1962. In 1970 or 1971, a doctor told him he had to get out of the coal dust. However, he continued working past his sixty-fifth birthday, finally quitting in October 1973. He stated then that he could no longer climb the three flights of "stairs" on his truck because he was out of breath when he got to the top. Several doctors examined Luk-

er. A 1973 pulmonary function study, administered by Dr. Getty, showed "moderately severe obstructive pulmonary disease." An examination by Dr. Connerey in the same year showed that Luker's "diaphragms moved poorly," and his ventilatory capacity was "29% of normal." Dr. Connerey concluded that Luker was 71% permanently disabled due to pneumoconiosis and obstructive emphysema. Dr. Stewart reported that Luker had a vital pulmonary function capacity of 47.4% of normal and agreed that Luker "definitely has chronic obstructive lung disease," "more than likely" caused by Luker's years of coal mining. Dr. Stewart concluded that Luker was "totally and permanently disabled from doing any gainful employment in which he is trained." Dr. Peters found an x-ray "highly suggestive of findings consistent with pneumoconiosis" and concluded that Luker "would be unable to perform any type of gainful employment in a coal mine."

Dr. Nay, retained by Old Ben, opined that Luker had "no evidence of pneumoconiosis" but agreed that Luker had "emphysema." Dr. Nay said that "no evidence" established that Luker's coal mine employment contributed to his pulmonary disease. X-ray evidence was interpreted variously as positive and negative by doctors. The most recent x-ray, dated October 22, 1974, was interpreted by Dr. Breitweiser to contain "calcification in small opacities" but no pneumoconiosis.

The ALJ credited medical reports interpreting a pulmonary function study and a chest x-ray. The ALJ also credited the reports of Drs. Connerey and Stewart. He specifically discredited the report of Dr. Nay and said: "The overwhelming weight of the evidence establishes the fact that Claimant does have pneumoconiosis and that Claimant does have a chronic obstructive lung disease with considerable emphysema."

The ALJ applied the law as it stood in 1977 when he rendered his original November 1977 decision and concluded that Luker was totally disabled from pneumoconiosis that arose out of his coal mine employment.

The ALJ therefore awarded benefits under "Part C" of the Act.[1] The ALJ noted that the relevant regulation, 20 C.F.R. § 410.-414, provided that pneumoconiosis may be established not only by x-ray, *id.* § 410.-414(a), but also by evidence of "a totally disabling chronic respiratory or pulmonary impairment," coupled with employment for fifteen years or more in a surface mine "where environmental conditions were substantially similar" to underground mines, *id.* § 410.414(b); 30 U.S.C. § 921(c)(4). The ALJ also noted that a third way to establish pneumoconiosis was by other relevant evidence establishing both that the miner has "a totally disabling chronic respiratory or pulmonary impairment and that such impairment arose out of employment in a coal mine." 20 C.F.R. § 410.414(c). The ALJ also concluded that Luker's disability was "a result of his many years of coal mining employment" and rejected Old Ben's argument that Luker was not totally disabled under 20 C.F.R. § 410.412.

The Board in its original March 1979 decision found substantial evidence to support the ALJ's finding that Luker had a totally disabling pulmonary impairment. It relied on four pulmonary function studies, reports by Drs. Stewart, Rucker and Peters, and Luker's testimony. The Board also approved the ALJ's finding that Luker's total disability arose out of coal mine employment, based on the presumption, contained in 30 U.S.C. § 921(c)(1) and 20 C.F.R. § 410.416(a), that where a miner suffering from pneumoconiosis establishes ten years of coal mine employment (in a surface or underground mine) the pneumoconiosis is presumed to have arisen from the coal mine employment. Nevertheless, the Board vacated the ALJ's award of benefits because it believed that the x-rays of record were insufficient to establish that Luker's totally disabling respiratory or pulmonary impairment was pneumoconiosis. The Board found that the ALJ had to rely on the presumption at 30 U.S.C. § 921(c)(4), and 20 C.F.R. § 411(c)(4), providing that where a miner with fifteen or more years of employment in underground coal mines or in conditions "substantially similar to conditions in an underground mine," demonstrates the existence of a totally disabling chronic respiratory or pulmonary impairment, "there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis." 30 U.S.C. § 921(c)(4); 20 C.F.R. § 411(c)(4). A majority of the Board held that in order to rely on this presumption the ALJ must make a specific finding that the environmental conditions during Luker's strip mine employment were comparable to conditions in an underground mine.

On remand, the ALJ considered testimony that the roads over which Luker drove were dusty enough to require the services of two water trucks to water down the dust. An absence of watering equipment contributed to high dust levels when coal was loaded and unloaded, and at the end of the day truck drivers' clothes were dirty and uncovered portions of their body were "just about as black as the coal." The ALJ concluded, in May, 1979, that conditions at the strip mine where Luker worked while loading, driving and unloading coal were occasionally intensely dusty and substantially similar to the conditions of dust exposure in underground mines. Therefore Luker "spent more than fifteen years performing jobs that exposed him to a heavy concentration of coal dust ... substantially similar to conditions in an underground mine" and Luker was entitled to the presumption that his totally disabling respiratory disease was pneumoconiosis. *See* 30 U.S.C. § 921(c)(4); 20 C.F.R. § 411(c)(4).

The Board in a second decision in February 1986 affirmed the supplemental ALJ findings, noting that the ALJ "gave a detailed description of the working conditions that he found to exist." The Board held that since the ALJ "provided [a] sufficient rationale to support his findings," it was unnecessary for the ALJ to resolve the alleged conflicts in Wool's and Luker's testimonies. The Board also held that Old Ben was "effectively precluded on this appeal from arguing the non-existence of statutory pneumoconiosis."

**1.** *See infra* at 693–94 (describing "Part B" and "Part C" of the Act).

While the ALJ's supplemental decision and order was pending before the Board, Old Ben filed a motion to be dismissed as the responsible operator on the ground that liability for Luker's claim should transfer from Old Ben to the Trust Fund under a provision in the 1981 Amendments to the Act (the "1981 Amendments"). *See* Pub.L. No. 97–119, § 205(a), 95 Stat. 1645 (1981) (codified at 30 U.S.C. § 932(c)(2), (j)(3)). This provision transfers liability for benefits from individual operators to the Trust Fund in cases in which there was "a claim denied before March 1, 1978, and [such claim] is or has been approved in accordance with the provisions of Section 945 of this title." 30 U.S.C. § 932(c)(2).

Old Ben sought to establish that this case met the transfer of liability criteria because Luker had filed a "Part B" claim in March, 1973 with the former Department of Health, Education and Welfare ("HEW"), before he filed a "Part C" claim in September, 1974 with the Department of Labor (the "DOL"), which was adjudicated by the ALJ and the Board.[2] The Part B claim, denied on February 7, 1975, was never reviewed and approved under section 945. Old Ben recognized that Department of Health and Human Services ("HHS") regulations require a claimant to elect review of a denied Part B claim within six months of the HHS mailing of a notice of election rights. Old Ben, however, sought to excuse Luker's failure to elect review on the ground that he never received notice of his right to do so. Because Luker had died on October 5, 1984, Old Ben relied on affidavits from Luker's widow and attorney claiming, respectively, that Luker did not receive an election notice and that Luker did not give his attorney an election card. The Director, Office of Workers' Compensation Programs (the "Director" and "OWCP"), conceded the existence of the Part B claim and that it was a "claim denied" under 30 U.S.C. § 902(i), but submitted an affidavit from a subordinate disputing Luker's non-receipt of a notice of election rights. According to the affidavit,

a computer printout of information on denied Part B claims shows that an election notice was mailed to Luker in March 1978. The computer record allegedly shows that Luker never elected review of this denied claim.

Old Ben concurrently sought to elect review for Luker, based on the widow's affidavit, and submitted this affidavit to the Board. The affidavit states that the widow "hereby elect[s] review" of Luker's denied Part B claim and "would like the Social Security Administration to review this claim again." The Board denied Old Ben's motion to dismiss in February, 1986, at the same time that it affirmed the ALJ's supplemental decision and order on benefits. The Board, relying on its previous decision in *Chadwick v. Island Creek Coal Co.*, 7 Black Lung Rep. 1–883 (1985), *aff'd en banc*, 8 Black Lung Rep. 1–447 (1986), found it unnecessary to decide whether Luker received an election card from the Social Security Administration (the "SSA") or whether the late filing of an election was valid and timely. The Board said that, even if no election card had been sent and the late election was valid, the denied Part B claim, upon review, would "merge into" Luker's Part C claim. As the Board construed the DOL regulations, this merger of claims would extinguish the Part B claim, leaving only the Part C claim, which was not "denied" on or before the effective date of the 1977 amendments, and therefore did not fall within the 1981 transfer of liability provision.

## II.

■ Two issues are presented on appeal: first, whether Luker is entitled to benefits, and, second, whether liability for Luker's benefits claim should transfer from Old Ben to the Trust Fund pursuant to the 1981 Amendments. This court's scope of review is limited to an evaluation of whether the ALJ's and the Board's decisions are rational, supported by substantial evidence and consistent with the applicable law.[3]

---

2. *See infra* at 693–94 (describing "Part B" and "Part C" of the Act).

3. With respect to review of the ALJ's decision, the standard of review is "whether the court of appeals believes that *the administrative law*

*O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*, 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965); *Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 589 (7th Cir.1985); *Peabody Coal Co. v. Benefits Review Board*, 560 F.2d 797, 799 (7th Cir.1977). On the question of Luker's entitlement to benefits, the ALJ considered all the relevant evidence, did not substitute his expertise for that of a qualified physician and based his conclusions on credible evidence. On that basis we think that substantial evidence supports the ALJ's findings that Luker was totally disabled by pneumoconiosis arising out of his coal mine employment. *See Peabody Coal Co. v. Director, OWCP*, 778 F.2d 358, 362–64 (7th Cir.1985).

The ALJ credited Dr. Stewart's assessment that Luker had a totally disabling pulmonary or respiratory impairment arising out of coal mine employment as consistent with earlier assessments by Drs. Getty and Connerey and with other evidence that Luker had a serious pulmonary impairment that totally disabled him. The ALJ also found it obvious from his own observations of Luker that the claimant was totally disabled from exposure to coal mine dust. The ALJ rejected Dr. Nay's report as "contrary to the overwhelming weight of the evidence." The ALJ thus appraised the medical evidence in a rational way. *See id.* at 363.

The ALJ also considered all the relevant evidence in determining that dust conditions in Luker's surface mining were substantially similar to conditions in an underground coal mine, thus bringing into play the presumption in 30 U.S.C. § 921(c)(4). The ALJ credited Luker's testimony about the heavy dust on the coal haulage roads and that miners went home with exposed parts of their bodies almost as black as the coal. The ALJ did not ignore the testimony of Old Ben's witness, Raymond Wools, that dust conditions underground were worse than at the surface mine, but gave less weight to this testimony for rational reasons. First, Wools had no knowledge of conditions until 1961, and, second, Wools admitted that the haulage roads after 1961 had to be watered continuously, thus showing the existence of a dust problem. Wools also conceded that watering equipment was not used at the loading area or at the tipple. Therefore, the ALJ reasonably concluded that Luker was exposed to dust conditions substantially similar to conditions in an underground mine for at least fifteen of his over forty years of coal mine employment.

In addition, the ALJ did not err in finding that Old Ben had failed to rebut the presumption at 30 U.S.C. § 921(c)(4) that Luker's totally disabling pulmonary impairment was pneumoconiosis. This presumption was "intended to be remedial and to assure that cases that should be compensated would be compensated. 'In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivor.'" *Old Ben Coal Co. v. Prewitt*, 755 F.2d at 593 (Cudahy, J., concurring) (*quoting* S.Rep. No. 743, 92d Cong., 2d Sess. 11, *reprinted in* 1972 U.S.Code Cong. & Admin.News 2305, 2315). The ALJ weighed all the medical evidence before issuing his first decision finding that Luker was totally disabled by pneumoconiosis arising out of his coal mine employment.

Later, pursuant to the remand from the Board, the ALJ specifically found that conditions during Luker's strip mine employment were comparable to conditions in an underground mine and therefore held that Luker's admitted pulmonary impairment could be presumed to be pneumoconiosis under 30 U.S.C. § 921(c)(4). As the Board recognized, the ALJ's prior findings, affirmed by the Board, and the broad statutory definition of pneumoconiosis, precluded Old Ben from arguing the nonexistence of statutory pneumoconiosis. *See Ansel v. Weinberger*, 529 F.2d 304, 310 (6th Cir. 1976) ("[t]o hold that presumed pneumoconiosis is rebutted by evidence which merely

*judge's decision* was supported by substantial evidence; if it was, then the Benefits Review Board's decision reversing the administrative law judge must itself be reversed, even if that decision could also be said to be supported by substantial evidence." *Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 589 (7th Cir.1985) (emphasis in original).

precluded a finding of true pneumoconiosis would render the presumption of Section 921(c)(4) a nullity"). Therefore we believe that the Board correctly affirmed the ALJ's finding that Luker was entitled to benefits.

### III.

The more difficult issue before us is whether liability for payment of benefits to Luker was transferred under the 1981 Amendments from Old Ben to the Trust Fund. As originally enacted, Title IV of the Federal Coal Mine Health and Safety Act of 1969 ("FCMHSA") established two programs—Parts B and C—under which coal miners totally disabled by work-related pneumoconiosis could receive benefits. Claims were adjudicated under Part B or Part C depending essentially on when they were filed. Part B was a federally funded program, administered by the SSA, a part of HEW, which governed all claims for benefits filed before January 1, 1973. Originally, Part C was a joint federal and state program, administered by the DOL, which governed claims filed between January 1, 1973 and December 31, 1976, relying primarily on state workers' compensation laws. If those laws did not provide adequate coverage, Part C claimants could file in a DOL program, which looked to coal mine operators to pay benefits.

In 1972, Title IV of the FCMHSA was designated by an amendment as the Black Lung Benefits Act. This amendment, which was intended to defer the transition from Part B to Part C claims, also extended the period for filing Part B claims to June 30, 1973, and postponed the effective date for Part C claims for one year until January 1, 1974. Claims filed between July 1, 1973 and December 31, 1973 were transition claims to be administered by the DOL, with benefits to be paid by the federal government. Also, the termination date for Part C claims was extended and then eventually removed.

By 1977, the Part B program was costing the federal government over $1 billion a year, and the Part C program had become primarily a federal responsibility due, *inter* *alia*, to the inadequacy of workers' compensation coverage and the inability of the DOL to identify responsible operators. In response to these problems, Congress amended the Act to create the Trust Fund to be financed by an excise tax on the sale of coal. The Trust Fund was to pay benefits in cases where a miner's last coal mine employment ended before January 1, 1970 or where a responsible operator could not be identified. Nonetheless, Congress intended to "ensure that individual coal operators rather than the trust fund bear the liability for claims arising out of such operators' mines to the maximum extent feasible." S.Rep. No. 209, 95th Cong., 1st Sess. 9 (1977), *reprinted in* House Comm. on Educ. and Labor, 96th Cong., Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977, 612 (Comm.Print 1979). In 1977, Congress also amended the Act by establishing more lenient standards of eligibility for benefits. Claims denied before March 1, 1978 (the effective date of the 1977 amendments) were to be reexamined under these less demanding standards. Review of pending or denied Part C claims was automatic. Review of pending or denied Part B claims was not automatic; rather the Secretary of HHS had to notify Part B claimants of their right to request review of these claims. Part B claimants were then "required to make an election" to have either the DOL or HHS review their claims.

Review by HHS was to be on the existing file. But, if the Part B claimant elected DOL review or if HHS did not approve the reviewed claim, the Part B claim was to be transferred to the DOL and the claimant would be permitted to supplement the evidence in his file. A request for review by either HHS or the DOL had to be received by the SSA within six months from the date on which the notice was mailed. 20 C.F.R. § 410.704(d). A failure to elect timely review of a Part B claim, absent "good cause," was considered a waiver under the HHS election regulation. 20 C.F.R. § 410.704.

The 1981 Amendments were adopted primarily in response to a growing concern

about the Trust Fund's increasing indebtedness to the Treasury. H.R.Rep. No. 406, 97th Cong., 1st Sess. 4, *reprinted* in 1981 U.S.Code Cong. & Admin.News 2673. These Amendments sought to reduce and ultimately eliminate the deficit by increasing both the excise tax on coal and the interest rate on operator liabilities to the Trust Fund, and by restricting eligibility for benefits. A transfer of liability provision, section 205, was also enacted in 1981 to provide relief to a certain class of coal operators and insurers from unexpected, retroactive liability arising from the 1977 amendments. Congress provided in 1981 that "in cases ... (3) in which there was a claim denied before March 1, 1978, and such claim is or has been approved in accordance with [the reopening of claims provision of the 1977 amendments]," the Trust Fund, and not individual coal mine operators, would be responsible for paying benefits. Pub.L. 97–119, § 205(a), 95 Stat. 1645 (codified at 30 U.S.C. § 932(c)(2), (j)(3)). This provision is in issue in this case.

Since there was concern in Congress that this transfer of liability could prove too burdensome for the debt-laden Trust Fund, legislators specifically requested information on how many claims would transfer, which claims they were and what their cost would be. *See Black Lung Benefits and Revenue Amendments of 1981: Hearings before the Subcomm. on Labor of the Senate Comm. on Labor and Human Resources,* 97th Cong., 1st Sess. 31, 77 (1981) (statement of Sen. Randolph); *id.* at 80 (statement of Sen. Nickles). Industry representatives testified that the amendment's definition of transferring claims included about 10,200 claims. An insurance industry representative broke these numbers down to an estimate that 8,000 Part B and 2,000 Part C claims were intended to be transferred, valued by another insurance representative at approximately $1.4 to $1.5 billion. These claims comprised only a fraction of the total number of claims that were or could have been reopened and reviewed under the more liberal 1977 eligibility criteria. 127 Cong.Rec. 31,511 (1981). The estimates were repeated by Representative Perkins (providing the SSA's explanation) who said:

> Together, the provisions will affect approximately 10,200 cases. This consists of approximately 8,000 cases originally filed with the Social Security Administration (1,400 Part B cases approved by SSA, and 6,543 Part B cases approved by DOL), and about 2,200 Part C, responsible operator cases.

127 Cong.Rec. 31,748 (1981).

Final regulations implementing the 1981 Amendments were issued by the DOL on May 31, 1983. *See* 48 Fed.Reg. 24,272–93 (1983) (codified at 20 C.F.R. §§ 718, 725). These regulations provide that, for a denied Part B claim to be subject to transfer, the claimant must have requested timely review by filing an election card or other equivalent document with the SSA, in accordance with 30 U.S.C. § 945(a), and the corresponding SSA regulation, 20 C.F.R. § 410.704. *See* 20 C.F.R. § 725.496(d). The regulations also provide that where a miner filed more than one claim prior to March 1, 1978, "the procedural history of each claim must be considered separately to determine whether the claim is subject to the transfer of liability provisions," unless SSA or DOL regulations required the claims to be merged. 20 C.F.R. § 725.-496(c). The DOL believed it was necessary to consider separately the procedural histories of the claims because Congress had relied on an estimate of roughly 10,200 claims to be transferred under the 1981 Amendments. Since this figure was meant to reflect the universe of transfer claims as accurately as possible, the DOL believed its regulations should attempt to produce a total number of transfer claims as close to the estimate as possible. The DOL believed its regulations would subject the Trust Fund to liability for an estimated 12,000 transfer claims, roughly consistent with Congress' original understanding. *See* 48 Fed.Reg. 24,282 (1983).

In adopting final rules, the DOL specifically discussed and rejected two methods for establishing transfer liability that ostensibly would achieve uniformity of claimant treatment. According to the DOL,

both methods were inconsistent with the express language of the transfer provisions of the 1981 Amendments and also inconsistent with congressional intent regarding the scope of the transfer provisions as well as with the future solvency of the Trust Fund. One proposal, which seems analogous to the Board's rationale in *Chadwick*, would merge a denied Part B claim into a pending Part C claim. The merged claim would assume the nontransfer status of the Part C claim, resulting in substantially fewer transfers than Congress presumably intended. *See* 48 Fed.Reg. 24,284 (1983). The other proposal would ignore the statutory language requiring election, and allow for automatic review when a claimant had a denied Part B claim and a pending Part C claim. This would result in a significant increase in the number of cases subject to transfer. *See id.* at 24,283–84. Since neither approach seemed consistent with congressional intent, the DOL believed it necessary to adhere to the statutory language making an election for review a condition precedent to transfer of liability. Only with this approach did the DOL feel that it had acted in accordance with congressional intent by providing for transfer solely of certain classes of claims. These were the claims having specific procedural histories that presumably had in the aggregate the estimated numerical and financial impacts that Congress had had in mind. The Director urges that we adopt the DOL's approach.

The DOL's construction of regulations to reflect Congress' purpose in enacting the 1981 Amendments warrants great deference from the courts, because the DOL is authorized to administer the statute. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). It is also significant that the DOL published its proposed regulations in May 1982, less than six months after the passage of the 1981 Amendments. This lends the regulations the authority associated with a contemporaneous construction of the statute. *See National Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). More specifically with respect to the *Chadwick* merger

analysis, since a theory of merger not unlike that adopted by the Board in *Chadwick* was considered and expressly rejected by the DOL in adopting the final regulations, there is a persuasive basis for rejecting the Board's theory here. The Board itself in *Chadwick* recognized the deference due the DOL regulations. *Chadwick,* 7 Black Lung Rep. at 1–891.

We generally accept the Director's argument that the regulations (at least as applied to the effects of merger) conform to, and reconcile, the various and interrelated purposes of Congress: altering eligibility requirements, bolstering the finances of the Trust Fund and transferring part of the unanticipated liabilities incurred by responsible operators under the 1977 amendments. In general, satisfaction of these purposes is achieved by honoring the number and kind of claims which Congress intended to be transferred.

None of the parties disputes that Luker's Part C claim adjudicated in this case fails to meet the statutory conditions for transfer of liability, because it was neither denied prior to March 1, 1978, nor reviewed and approved under the 1977 amendments. On the other hand, Luker's Part B claim was indeed "denied" before March 1, 1978, and Old Ben argues that the claim should also be considered reviewed and approved under the 1977 amendments. Old Ben argues that Luker's Part B claim qualifies for transfer of liability because Luker's widow recently "elected" review of the claim and, in the alternative, because the Part B claim can be merged with the Part C claim so that the two claims together will meet the denial and approval conditions for transfer.

The Board, of course, did not decide whether Luker's election was valid and timely, but rather interpreted the DOL regulation, 20 C.F.R. § 725.496(c), to mean that the reviewed Part B claim would merge into the earliest claim filed with the DOL—here the Part C claim. Under this analysis, the surviving, post-merger claim (the Part C claim) would not support transfer because it would have been pending on

the effective date of the 1977 Act. *See Chadwick*, 7 Black Lung Rep. at 1–895.

The Director urges that we agree with the Board's result but reject its analysis. According to the Director, Old Ben's attempt to transfer liability must fail for two reasons: first, because any election for review of the Part B claim must be addressed to the SSA rather than to the Board (a part of the DOL), and second, even if a DOL election were permissible, Old Ben has not established good cause for Luker's failure to request review within six months of notification by the SSA of his election rights. The Director suggests that the DOL, in explaining and promulgating its 1983 regulations, rejected the approach of the Board toward defining transferability of claims, which the Board adopted in dicta in *Chadwick*. As discussed above, the DOL considered and rejected two alternative methods of calculating transferability, concluding that they failed adequately to achieve Congress' apparent intended result. The Director suggests that the Board erred in *Chadwick* and in its arguments in this case in construing what claims are transferable. The Director also disagrees with the Board's premise that the DOL regulations on merger of claims require a Part B claim to merge "into" a pending Part C claim. Instead, the Director claims that the regulations provide that certain claims will merge "with" instead of "into" certain other claims and say nothing about how the merged claim should be treated for transfer of liability purposes. *See* 20 C.F.R. §§ 410.705(c), 725.309(c), (d), and 727.103(c).

With respect to the Director's first argument against Old Ben's position, HHS requires that a request that either HHS or the DOL review a denied Part B claim must be received "by the Social Security Administration" within six months from the date the SSA mailed an election notice to the Part B claimant unless good cause exists to extend the period. 20 C.F.R. § 410.704(d). The DOL regulations reflect the same requirement. 20 C.F.R. § 725.496(d). There are no provisions in the regulations of either HHS or the DOL for an election for a Part B claim review to be made to the DOL. The Director contends that the regulations in question have been promulgated pursuant to a broad grant of congressional authority, *cf.* 30 U.S.C. § 936, and must be upheld because they are permissible constructions of the statute.[4] *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The regulations carry out the congressional purpose that HHS and the DOL work out a procedure "to avoid both agencies simultaneously reviewing the claim of any claimant previously denied under Part B and later denied, pending, or entitled under Part C." H.R.Conf.Rep. No. 864, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin.News 237, 315. The Director also contends that the procedure requiring an election addressed to the SSA carries out the congressional intent to restrict transfer of liability only to certain classes of cases. Further, the Director points out that Old Ben offers no reason for the request for review to be addressed to the Board rather than to the SSA.

The other branch of the Director's argument is that, quite apart from the fact that the election is now being submitted to the "wrong" agency, the evidence Old Ben has presented is insufficient to establish the requisite good cause to excuse Luker's failure earlier to request review of his Part B claim. *See* 20 C.F.R. § 410.704(d). This regulation provides that good cause does not exist "when there is evidence of record that the individual was informed that he or she should respond timely and the individual failed to do so because of negligence or

**4.** Old Ben counters, based on certain ALJ and Board decisions, that the DOL has been inconsistent in its interpretation of the transfer provisions. But the decisions of the Board and of the ALJs are not chargeable to the Director. Both the ALJs and the Board function in independent adjudicatory capacities. On the other hand, the Director, as the delegate of the Secretary of Labor, exercises rulemaking authority and, of course, his interpretations are entitled to deference. *See Potomac Elec. Power Co. v. Director, OWCP*, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980); *Peabody Coal Co. v. Blankenship*, 773 F.2d 173, 175 (7th Cir. 1985).

intent not to respond." *Id.* The Acting Deputy Commissioner in the DOL's Branch of Claims and Review, OWCP, as official custodian, submitted an affidavit based on a computer printout provided by the SSA purporting to establish that Luker was mailed an election notice on March 24, 1978 and that he did not respond to it. There is a presumption that the affidavit was made in good faith and that the official acts which it describes were actually performed. "[C]lear evidence to the contrary" is required to rebut the presumption of official regularity. *See United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *United States ex rel. Adamantides v. Neelly,* 191 F.2d 997, 999 (7th Cir.1951).

Arguably it may be presumed that the notice was received by Luker because "a timely and accurate mailing raises a rebuttable presumption that the mailed material was received." *In re Nimz Transp., Inc.,* 505 F.2d 177, 179 (7th Cir.1974) (citing *Hagner v. United States,* 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932)). The Director contends that the affidavits from Luker's widow and from his attorney presented by Old Ben are insufficient to rebut the presumption that the HHS election notice was received. Of course, these affidavits may be somewhat suspect because both affiants would presumably prefer to have the Director, who admits Luker's eligibility for benefits, be responsible for Luker's claim rather than Old Ben, which continues to contest eligibility.[5]

Therefore, based on his evidence of the mailing of the notice to Luker and its nonreceipt by HHS, together with Old Ben's belated filing with the wrong agency, the

Director would have us reject the Board's rationale but affirm its result denying transfer of liability to the Trust Fund. As noted, the Board, relying on *Chadwick,* found it unnecessary to decide whether Luker's election for review was "valid and timely." Instead the Board relied on its merger analysis, which we reject. Apparently, the Board (whose position is, of course, not represented before us) believed the merger analysis would advance uniformity of claimant treatment.

At oral argument we raised the question whether, under *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), a decision of the Board could be affirmed on a ground different from the ground relied on by the Board. In a supplemental brief the Director has argued that the Board is "solely . . . an adjudicatory forum" and has "no policymaking functions." *See* Supplemental Brief for the Director, OWCP at 2 (citing *Potomac Elec. Power Co. v. Director, OWCP,* 449 U.S. at 278 n. 18, 101 S.Ct. at 514 n. 18). "Decisions of the Board, like decisions of district courts may . . . be affirmed on any ground advanced by an appellee or respondent, because such an affirmance creates no danger that the court will intrude into areas of policymaking set aside exclusively for the agency." *Id.* Of course, Congress granted the Secretary of Labor, rather than the Board, the authority to administer Part C of the Act and to make regulations as he deems appropriate. 30 U.S.C. §§ 932(a), 936(a). The Secretary has delegated this authority to the Director, OWCP. 20 C.F.R. § 701.202. We agree with the Director to the extent that we think the Board owes some deference to the Director's interpretation of the

---

5. Old Ben also argues in its reply brief that it was not necessary for Luker to submit a formal election card to obtain review of his denied Part B claim (since the action was not specifically required by section 435 of the Act, 30 U.S.C. § 945(a)(1)). Old Ben suggests that, since Luker pursued his Part C claim which was pending on March 1, 1978, and was reviewed by the DOL pursuant to section 435, he in effect elected by the simplest means to obtain DOL review in accordance with section 435 of the Act. It is claimed that, although Luker did not specifically request review of his Part B denial, he also did not waive that right.

We do not accept this argument as a way around the SSA regulations which require a specific election—whether by the formal election card or by some other means—to have the Part B claim reviewed. Under the controlling SSA regulations, 20 C.F.R. § 704, Luker must have made a timely specific election to have the Part B claim reviewed. We believe that to accept Old Ben's argument on this point would be to ignore the controlling regulations and with them the congressional intent to limit transfer to the number and type of claims already discussed.

DOL regulations, within the usual limitations.

We believe, however, partly because of *Chenery* considerations and more importantly because factfinding is involved, that a remand is appropriate, if not required, here. It is a considerable overstatement to assert that the Board has no policymaking functions. An adjudicatory role by no means excludes the making of policy. Having said all this, however, we do not believe that, under the particular facts of this case, the filing of an election with the "wrong" agency, here with the Board (a part of the DOL) instead of the SSA, could alone preclude transfer of liability. After all, the DOL is the agency charged with administering the law and it is highly likely that an election delivered to the Board would find its way to its proper destination. In fact, the affidavit supplied by Luker's widow specifically requests review by HHS, not by the DOL.[6] Here the notification was made directly to the Board and served on the Solicitor of the DOL; there is no suggestion how any party could have been prejudiced by this technical misdelivery. Nor is there reason to believe that filing with the SSA as opposed to the Board will have an appreciable effect on the number of cases reviewed and transferred (thus violating congressional intent). At least under the present facts, we conclude as a matter of law that the misdirection of the election is not alone sufficient to defeat transfer.

This leaves us, however, with significant questions of fact on the issue of "good cause" for the late filing. The issue is whether the affidavits submitted by Old Ben are sufficient in light of the good cause requirement for late elections. We believe these are issues properly for the Board, as the finder of fact, and not in the first instance for this court.

We therefore remand to the Board for consideration in light of the regulations of the DOL and the SSA to determine whether liability should transfer from Old Ben to the Trust Fund. As we have noted, entitlement to the benefits has been established. Also as noted, merely filing with the DOL instead of the SSA under the present facts does not render the filing invalid. But factfinding by the Board is required to determine whether there has been compliance with the regulations in other respects. The final decision and order of the Board insofar as it relates to transfer of liability is therefore vacated and the matter is remanded to the Board for redetermination of transfer liability.[7]

AFFIRMED IN PART, VACATED IN PART AND REMANDED.

---

**6.** Mrs. Luker in her affidavit says:

I would like the Social Security Administration to review [Elmer Luker's] claim again. Attachment E to Old Ben's Motion to Dismiss, filed June 22, 1985.

**7.** After issuance of this opinion, the director, OWCP, asked for clarification of procedures on remand, with the possibility of reference to the SSA for an initial determination of "good cause."

Old Ben in a response appears to support the suggestion for reference to the SSA and raises the further possibility of an administrative determination by DOL as to transfer.

In the present context, the "good cause" determination is relevant only to the question of transfer liability (i.e. whether Old Ben or the Trust Fund is liable). Therefore, we contemplate that the Board (to which we remand the transfer of liability question) will, if factual questions are involved, refer the matter to an ALJ for an appropriate hearing.

The interested government agencies (SSA and DOL) may appear to present their view of the good cause issue or any related issue together with their view of the appropriate weight to be accorded their position under the governing regulations and statutes. Old Ben or any other affected party may, of course, also appear and participate at the hearing.

The ALJ's determination is, of course, subject to review by the Board, with right of appeal to the courts.

No question of entitlement to benefits remains since these have been decided by this opinion; hence, we do not understand the references to "eligibility" in the submissions before us.