**CANEY CREEK COAL COMPANY; Old Republic Insurance Companies, Petitioners,**

v.

**Alma SATTERFIELD; Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 96–4246.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 1, 1997.

Decided July 9, 1998.

Laura Metcoff Klaus (argued and briefed), Arter & Hadden, Washington, DC, for Petitioners.

Ronald K. Bruce, Greeneville, KY, for Respondent.

Christian P. Barber (argued and briefed), U.S. Department of Labor, Office of the Solicitor, for Respondent.

Before: NORRIS, SUHRHEINRICH, and CUDAHY,* Circuit Judges.

## OPINION

CUDAHY, Circuit Judge.

When Congress established a system in which a federal trust fund paid for certain claims filed by pneumoconiosis-disabled coal miners, and mine operators and their insurance carriers paid for others, litigation was certain to follow. And follow it has. *See, e.g., Lovilia Coal Co. v. Harvey,* 109 F.3d 445 (8th Cir.1997); *Helen Mining Co. v. Director, Office of Workers' Compensation Programs,* 924 F.2d 1269, 1271–73 (3d Cir.1991) (en banc); *Director, Office of Workers' Compensation Programs v. Quarto Mining Co.,* 901 F.2d 532 (6th Cir.1990); *Old Ben Coal Co. v. Luker,* 826 F.2d 688, 693–94 (7th Cir. 1987). This is yet another appeal in which we are asked to determine which entity should bear the cost of a coal miner's disability benefits. As will become apparent, we agree with the Benefits Review Board that because the miner failed to elect review of a

---

* The Honorable Richard D. Cudahy, Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

claim he filed in 1973, liability properly rests with the mine operator. But before plunging into the particulars of this case, we revisit the statutory framework that governs the disability claims of coal workers afflicted with pneumoconiosis (black lung disease).

## I. Background

Other opinions have thoroughly described the complicated history of congressional efforts to provide benefits to disabled coal miners and their survivors, *see e.g., Helen Mining,* 924 F.2d at 1271–73; *Luker,* 826 F.2d at 693–94, so we only summarize the events that led to the statutory provisions relevant to this appeal. In 1969, Congress first provided benefits for the survivors of miners who had died from pneumoconiosis, as well as for miners who were totally disabled by the disease. *See* Federal Coal Mine Health and Safety Act, Subchapter IV, Pub.L. No. 91–173, 83 Stat. 792 (1969) (codified, as amended, at 30 U.S.C. §§ 901—945) (1969 Act). Congress revisited the benefits issue in 1972 and 1977, and each time liberalized the criteria for proving disability. *See* Black Lung Benefits Act of 1972, Pub.L. No. 92–303, 86 Stat. 150 (1972) (codified at 30 U.S.C. § 901 *et seq.*) (1972 Act); Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95 (1978) (codified at 30 U.S.C. § 901 *et seq.*) (1977 Act).

Congress "anticipated a shifting responsibility" for disability claims, both in terms of which federal agency would process the claims and which entity would bear the cost of paying benefits. *Helen Mining,* 924 F.2d at 1271. Responsibility for processing claims was shared by the Department of Labor (DOL) and the Social Security Administration (SSA) (then under the direction of the Department of Health, Education, and Welfare (HEW)). "Part B" claims—those filed on or before June 30, 1973—were processed by the SSA.[1] "Transition claims"—those filed from July 1, 1973, to December 31, 1973—and "Part C" claims—those filed on or after January 1, 1974—were handled by the DOL.[2] This apportionment of claims also governed liability. *Id.* Part B and transition claims were paid by the federal government, while Part C claims were paid by the responsible mine operators or their successors.[3] *See* 1969 Act, §§ 411(a), 422(a)-(d), 83 Stat. 793, 796; *Luker,* 826 F.2d at 693.

When Congress further liberalized the benefits standards with the passage of the 1977 Act, it directed the SSA and the DOL to apply the new criteria to all previously-denied and pending claims. The DOL was to automatically review all previously-rejected transition and Part C claims, while HEW was to notify each claimant with a denied Part B claim of the right to request review by the SSA or the DOL.[4] *See* 30 U.S.C. § 945. Part B claims thus reopened only upon the claimant's request. Any Part B claim that was granted under the liberalized criteria converted to a Part C claim for the purposes of liability—that is, the responsible mine operators or their successors were responsible for the payment of benefits. *See Helen Mining,* 924 F.2d at 1271. In addition, the 1977 Act continued to hold mine operators responsible for most Part C claims.[5] Mine operators therefore were lia-

1. Part B of the 1969 Act provided that the SSA would process claims filed on or before December 31, 1972. The 1972 Act extended the SSA's involvement—and hence the Part B program—to June 30, 1973.

2. The 1969 Act provided that the Part C program would terminate on December 30, 1976. The 1972 Act continued the program until December 30, 1981, and the 1977 Act continued it indefinitely. *See Helen Mining,* 924 F.2d at 1271–72.

3. Congress originally anticipated that the majority of Part C benefits would be paid pursuant to state workers' compensation statutes that the DOL found to provide adequate disability coverage for pneumoconiosis; liability transferred to the mine operator only if the state statute was inadequate. But since the DOL did not approve a single state workers' compensation statute, mine operators were effectively charged with responsibility for all Part C claims. *Helen Mining,* 924 F.2d at 1271.

4. A claimant who elected review by the DOL was free to supplement the record; a claimant who elected review by the SSA had to rely on the existing record. *See Luker,* 826 F.2d at 693.

5. The federal government assumed liability for the benefits of miners who terminated their employment in the coal industry prior to January 1, 1970, and for benefits that were attributable to mine operators who could not be located. *See Helen Mining,* 924 F.2d at 1272.

ble for the vast majority of benefits granted under the terms of the 1977 Act.

Not surprisingly, this unanticipated liability "began to wreak havoc" in the coal industry, as "mine operators found themselves saddled with a massive, retroactive, unanticipated liability for Part C claims which their insurers refused to cover." *Id.* at 1273. To help alleviate this problem, Congress passed the Black Lung Benefits Amendment of 1981, Pub.L. No. 97–119, 95 Stat. 1643 (1981) (codified at 30 U.S.C. § 901 *et. seq.*) (1981 Amendment). The 1981 Amendment relieved mine operators of responsibility for claims that were denied before March 1, 1978, and approved in accordance with the liberalized criteria of the 1977 Act. *See* 30 U.S.C. § 932(c). Liability for these claims was assumed by the federal Black Lung Disability Fund, which Congress created at the time of the 1977 Act. *See* Black Lung Revenue Act of 1977, Pub.L. No. 95–227, 92 Stat. 11 (1978). For mine operators and their insurance carriers, the 1981 Amendment ascribed new significance to the statutory language mandating that the SSA and the DOL review denied Part B claims "upon request of the claimant." 30 U.S.C. § 945(a). With respect to liability, the practical effect of this language was that unless a claimant elected review, the previously-denied claim could not reopen and liability for the miner's benefits could not transfer to the Fund. This legal subtlety became critical when some claimants began filing new applications instead of requesting review of their previously-denied claims.

The coal miner in this case, Raymond Satterfield, filed two benefit applications. He completed his first application on June 27, 1973. The SSA received the application on July 2, 1973, and processed it as a Part B claim. In November 1973, the SSA notified Satterfield that it had denied the claim. Satterfield took no further action until May 1978, when he filed another application with the DOL. After Satterfield died in December 1978, his widow pursued this claim. In August 1981, the DOL granted benefits and identified Caney Creek Coal Company as the responsible mine operator.

Caney Creek requested a formal hearing before an administrative law judge (ALJ), thereby initiating a series of proceedings (including three hearings before an ALJ and two appeals to the Benefits Review Board) that addressed the merits of Satterfield's application and whether the mine operator was liable for the claim. The intricacies of these administrative goings-on need not concern us; for our purposes, the relevant point is that the ALJ and the Board found Satterfield entitled to benefits and Caney Creek responsible for his claim. Relying on its prior decisions and 20 C.F.R. § 725.496(d), the Board held that "for a denied Part B claim to be subject to transfer, the miner must have timely requested review of the denied claim by filing an election card." Op. of 11/27/90 at 3. Caney Creek asked the Board to reconsider its ruling in the wake of this circuit's opinion in *Director, Office of Workers' Compensation Programs v. Quarto Mining Co.*, 901 F.2d 532 (6th Cir.1990). On reconsideration, the Board found that *Quarto Mining* was inapplicable to Satterfield's claim and reaffirmed Caney Creek's liability. Order of 6/13/93 at 2.

■ After the Board issued its final order in September 1996, Caney Creek made a timely appeal to this court. *See* 33 U.S.C. § 921(c), *incorporated by reference in* 30 U.S.C. § 932(a). The sole issue is whether Caney Creek is liable for Satterfield's claim. As is well established, we review the Board's decision to ensure that it "did not commit a legal error or exceed its statutory scope of review of the ALJ's findings." *Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 901 (6th Cir.1996). Our review of the Board's legal conclusions is plenary, *see Peabody Coal Co. v. Greer*, 62 F.3d 801, 804 (6th Cir.1995); the Board may set aside an ALJ's factual findings only if they are not supported by substantial evidence, *see McMahon*, 77 F.3d at 901.

II. Election

■ While Caney Creek ultimately argues that Satterfield's 1973 application was a transition claim—not a Part B claim, as was assumed by the Board—the company first asserts that if Satterfield filed a Part B

claim, the Board erred in determining that Satterfield had to elect review of that claim before liability for his benefits could transfer to the Fund. The text of the 1981 Amendment provides:

> [N]o benefit shall be payable by any operator on account of death or total disability due to pneumoconiosis ... which was the subject of a claim denied before March 1, 1978, and which is or has been approved in accordance with the [liberalized criteria of the 1977 Act].

30 U.S.C. § 932(c). As this quotation indicates, the statute itself says nothing about an election process. And there is no question that Satterfield's original claim was denied before March 1, 1978, or that his 1978 application was approved in accordance with the liberalized standards. As Caney Creek sees it, the plain language of § 932(c) thus mandates that responsibility for Satterfield's benefits transfer to the Fund.

■ This argument, however, ignores regulations promulgated by HEW and the DOL. These regulations provide that to revive a denied Part B claim and subject it to transfer, a claimant must request review by returning to the SSA an election card or "other equivalent document" within six months from the date the SSA mailed notice of the right to review. *See* 20 C.F.R. §§ 410.704(d); 725.496(d).[6] Because HEW and the DOL promulgated these regulations pursuant to a broad grant of congressional authority, *see* 30 U.S.C. § 936(a), we must uphold them so long as they reflect a permissible construction of the statute. *See Luker,* 826 F.2d at 696 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984));

*see also Lovilia Coal Co. v. Harvey,* 109 F.3d 445, 449 (8th Cir.1997). Caney Creek never explicitly asserts that the regulations are an impermissible construction of the 1981 Amendment, but presumably that is the import of statements such as, "The Director's myopic focus on election cards and applications forms is nothing more than a budgetary contrivance to offload Trust Fund liabilities on operators in contravention of the intent of Congress." Petitioner's Br. at 19.

This circuit, however, has already recognized that Congress wished to limit the amount of liability that the 1981 Amendment would shift to an already debt-laden Fund. *See Earl Patton Coal Co. v. Patton,* 848 F.2d 668, 672 (6th Cir.1988). Congress therefore sought "to accommodate only a limited number of claims within estimated cost limitations." *Id.* Representatives from the insurance industry testified that the 1981 Amendment would transfer about 10,200 claims to the Fund—"only a fraction of the total number of claims that were or could have been reopened and reviewed under the more liberal ... eligibility criteria." *Luker,* 826 F.2d at 694 (citing 127 Cong. Rec. 31,511 (1981)). The DOL anticipated that the regulations would permit liability for 12,000 claims to transfer to the Fund, a figure "roughly consistent with Congress' original understanding." *Id.* (citing 48 Fed.Reg. 24,282 (1983)). And the regulations served another purpose as well, since Congress wished the SSA and the DOL to avoid simultaneously reviewing previously-denied Part B claims under the liberalized criteria. *See id.* at 696 (citing H.R. Conf. Rep. No. 864, 95th Cong., 2d Sess. 21–22, reprinted in

---

**6.** SSA regulations provide:

A request for review by the Social Security Administration or the Office of Workers' Compensation Programs, must be received by the Social Security Administration within 6 months from the date on which the notice is mailed.... If a request for review by the Social Security Administration or the Office of Workers' Compensation Programs is not received by the Social Security Administration within 6 months from the date the notice is mailed, the claimant shall be considered to have waived the right of review ... unless good cause can be established for not responding within this time period.

20 C.F.R. § 410.704(d).

DOL regulations provide:

No claim filed with and denied by the Social Security Administration is subject to the transfer of liability provisions unless a request was made by or on behalf of the claimant for review of such denied claim under section 435. Such review must have been requested by the filing of a valid election card or other equivalent document with the Social Security Administration in accordance with section 435(a) and its implementing regulations....

20 C.F.R. § 725.496(d).

1978 U.S.Code Cong. & Admin. News 237, 315). Because an election card required the claimant to request review by *either* the SSA or the DOL, and the designated agency undertook the review only after the claimant returned the card to the SSA, the regulations prevented both agencies from reviewing the same claim. In sum, then, the regulations requiring a claimant to return an election card or "other equivalent document" to the SSA are a wholly permissible construction of the 1981 Amendment. As such, we cannot disregard them and hold that the plain language of 30 U.S.C. § 932(c) mandates that liability transfer to the Fund.

Perhaps cognizant that we would be unwilling to ignore the regulations that require an election card, Caney Creek next asserts that the regulations simply do not apply in this particular instance. Here Caney Creek seeks to capitalize on this circuit's opinion in *Quarto Mining, supra.* The miner in that case filed two Part B claims with the SSA, one in 1970 and the other in 1972. He also filed a Part C claim with the DOL in 1979. *See* 901 F.2d at 534. When the DOL awarded benefits to the miner, the responsible mine operator, Quarto Mining, requested a hearing before an ALJ. The company then moved to have liability transfer to the Fund, with the miner joining in the motion. The miner testified that he had not received notice from the SSA regarding the right to have his Part B claims reviewed under the liberalized criteria. *See id.* After the hearing, the ALJ gave the DOL twenty days to challenge the miner's assertion that he had not received notice. But the DOL failed to offer evidence on this point in a timely fashion. *See id.* Accordingly, the case compelled "the consideration of the consequences of a total lack of notice to the claimant on that claimant's ability to reopen a Part B claim and the operator's ability to transfer its liability to the trust fund." *Id.* at 537. The *Quarto* court concluded that "where the claimant has failed to file an election card, that claimant's presentation of that issue or the operator's raising of the transfer liability issue at a formal disability hearing suffices as a legitimate filing of a Part B claim." *Id.*

Caney Creek emphasizes that at the hearing before the ALJ, both the company and Mrs. Satterfield requested that liability transfer to the Fund. This fact alone, however, does not make this case analogous to *Quarto Mining.* Indeed, Caney Creek's attempt to shoehorn Satterfield's claim into the confines of *Quarto Mining* ignores a crucial distinction between the two cases. In *Quarto Mining,* there was no evidence suggesting that an election card had been sent to the miner. Here, however, the record includes a computer printout indicating that the SSA mailed Satterfield an election card on March 24, 1978. A "timely and accurate mailing raises a rebuttable presumption that the mailed material was received." *Luker,* 826 F.2d at 697 (internal quotation marks and citations omitted). And while Mrs. Satterfield testified that she does not remember her husband receiving a card, this testimony is insufficient to rebut the presumption. The election card was not addressed to Mrs. Satterfield and it is by no means certain that her husband would have mentioned his receipt of the card to her. Accordingly, this is not a case that involves "a total lack of notice to claimant," and we cannot hold that liability transfers to the Fund pursuant to *Quarto Mining.*

■ Determined to leave no stone unturned, Caney Creek also contends that Satterfield did in fact satisfy the regulations requiring an election. As previously explained, the applicable regulations authorize review of a previously-denied claim and a transfer of liability if the claimant files an election card or "other equivalent document" within six months of the date on which the SSA mailed notice of the right to review. *See* 20 C.F.R. §§ 410.704(d), 725.496(d). Satterfield filed his 1978 application with the DOL approximately two months after the SSA mailed his election card. Caney Creek argues that the 1978 application therefore constitutes an "other equivalent document."

Caney Creek's theory admittedly has some commonsense appeal. When Satterfield filed his Part C application in 1978, he probably perceived himself as electing the DOL to help him pursue his previously-denied claim. However, a holding that a Part C claim is an

"equivalent document" would effectively nullify the requirement that a claimant make a formal election. When the DOL formulated its regulations, it considered a proposal which "ignore[d] the statutory language requiring election, and allow[ed] for automatic review [and transfer] when a claimant had a denied Part B claim and a pending Part C claim." *Luker*, 826 F.2d at 695. The DOL rejected this proposal on the ground that it would make more claims subject to transfer than Congress had intended. *See id.* (citing 48 Fed.Reg. 24,283–84 (1983)). The spin that Caney Creek puts on "other equivalent document" is, of course, almost identical to the proposal the DOL rejected—except that Caney Creek apparently would limit "other equivalent document" to Part C applications that were pending within six months of a claimant's receipt of an election card. While Caney Creek's formulation may reduce the number of claims eligible for transfer,[7] we nonetheless decline to adopt a theory akin to one that "was considered and expressly rejected by the DOL in adopting the final regulations." *Id.; see also id.* at 697 n. 5. Accordingly, when Satterfield filed his 1978 application, he did not circumvent the regulations that require a specific election in order to resuscitate a Part B claim.

## III.   Transition Period Claim

■ As we indicated at the outset, when Caney Creek challenges the Board's determination that Satterfield failed to elect review, the company assumes for the sake of argument that the SSA properly processed Satterfield's 1973 application as a regular Part B claim. Satterfield completed his application on June 27, 1973, but it was date-stamped as received by the SSA on July 2, 1973. The "transition period"—in which claims were·to be processed by the DOL—began on July 1, 1973. *See* 30 U.S.C. § 925(a). No election was required for the reopening of transition claims, since Congress directed the DOL to provide automatic review. *See* 30 U.S.C. § 945(b)(1). And as a transition claim subject to automatic review, Caney Creek argues, liability for Satterfield's benefits should have transferred to the Fund regardless of the lack of election.

The ALJ, however, concluded that Satterfield had in fact filed a Part B claim. Order of 10/20/86 at 2. We agree with this finding, since the filing date is not always determined by when an application is received by the SSA. The relevant regulation provides:

(a) Date of receipt. Except as otherwise provided in this part, a claim is considered to have been filed only as of the date it is received at an office of the [Social Security] Administration or by an employee of the Administration who is authorized to receive such claims.

(b) Date of mailing. If the claim is deposited in and transmitted by the U.S. mail and the fixing of the date of delivery as the date of filing would result in a loss or impairment of benefit rights, it will be considered to have been filed as of the date of mailing. The date appearing on the postmark (when available and when legible) shall be prima facie evidence of the date of the mailing. If there is no postmark or it is not legible, other evidence may be used to establish the mailing date.

20 C.F.R. § 410.227. If the SSA processed Satterfield's claim as ·having been filed in July, Satterfield risked the loss of benefits for the month of June. *See* 30 U.S.C. § 924(c). While Caney Creek counters that a July filing would not have deprived Satterfield of benefits because "he could not have qualified for an SSA black lung award unless he had complicated or advanced pneumoconiosis," Reply Br. at 4, this argument places the cart before the horse. When the SSA received Satterfield's application, the agency

---

7.  Neither party has provided information that allows us to approximate the number of claims that would transfer to the Fund if we endorsed Caney Creek's interpretation of "other equivalent document." We know only that the DOL received upwards of 76,000 claims between March 1, 1978, and December 31, 1980, *see* Annual Report on the Administration of the Black Lung Benefits Act During Calendar Year 1980, Table 1

(Employment Standards Admin., U.S. Dep't of Labor 1982), and that no election has been made with respect to over 47,000 denied Part B claims, *see* Report to Congress by the Comptroller General of the United States, *Legislation Allows Black Lung Benefits to Be Awarded Without Adequate Evidence of Disability*, HRD–80–81 at 1 (July 28, 1980).

had to decide whether to adjudicate the claim or forward it to the DOL. Whether Satterfield was eligible for benefits could only be determined *after* the SSA assigned the claim to an agency. Because we must presume that the SSA acted in accordance with its regulations in the absence of clear evidence to the contrary, *see United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Donaldson v. United States*, 264 F.2d 804, 807 (6th Cir.1959), we are satisfied that the SSA processed Satterfield's application as a Part B claim to avoid impairing his right to benefits. And, as we have already explained, because Satterfield did not elect review of his previouslydenied claim, liability for his benefits cannot transfer to the Fund. Accordingly, the decision of the Benefits Review Board is AFFIRMED.

