924 F.2d 1269
 HELEN MINING COMPANY and Old Republic Insurance Company, Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR and John Burnsworth, Respondents.
 No. 89-3418.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1989.
Reargued Oct. 9, 1990.
Decided Jan. 28, 1991.
 
 Mark E. Solomons (argued), Arter & Hadden, Washington, D.C., for petitioners.
 
 
 1
 Robert P. Davis, Sol. of Labor, Donald S. Shire, Associate Sol., Ronald G. Ray, Sr., Michael J. Denney (argued), Counsel for Appellate Litigation, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., for respondent Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor.
 
 Argued Dec. 1, 1989
 
 2
 Before BECKER, and STAPLETON, Circuit Judges, and KELLY, District Judge.*
 
 Reargued Oct. 9, 1990
 
 3
 Before HIGGINBOTHAM, Chief Judge, and SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD and ALITO, Circuit Judges.
 
 OPINION OF THE COURT
 
 4
 GREENBERG, Circuit Judge.
 
 
 5
 Helen Mining Company and its insurer, Old Republic Insurance Company, petition this court for review of a decision and order of the Benefits Review Board which affirmed an administrative law judge's finding that Helen is liable for black lung benefits granted its former employee John Burnsworth. Helen and the Director, Office of Workers' Compensation Programs, agree that Burnsworth was entitled to the black lung benefits so that the question now presented is whether the cost of the benefits is to be borne by Helen or by the Black Lung Disability Trust Fund (the "Fund"). The answer to the question depends on whether Helen can effect a transfer of liability for Burnsworth's benefits from it to the Fund by asserting "good cause" for Burnsworth's failure to request review of an earlier denied claim for benefits. Accordingly, we revisit the problem we considered in Rochester & Pittsburgh Coal Co. v. Krecota, 868 F.2d 600 (3d Cir.1989), in which we held that under the Black Lung Benefits Act a request for review of denied benefits must come from the miner, not the mine operator.
 
 I. THE STATUTORY AND FACTUAL BACKGROUND
 
 6
 The statutory background we confront could hardly be more complicated. In 1969, Congress promulgated the Federal Coal Mine Health and Safety Act, Pub.L. No. 91-173, 83 Stat. 792 (1969) (the "1969 Act"). In Title IV of the 1969 Act (in 1978, entitled the "Black Lung Benefits Act," Pub.L. No. 95-239, Sec. 16, 92 Stat. 105 (1978)), finding that there were a significant number of coal miners seriously affected by pneumoconiosis--i.e., "black lung" disease--, Congress provided for temporary benefits for the survivors of miners who had died from, and for those miners totally disabled by, this disease. Pub.L. No. 91-173, Secs. 401-426, 83 Stat. 792-798 (codified, as amended, at 30 U.S.C. Secs. 901-945). The 1969 Act anticipated a shifting responsibility for the administration of claims for these black lung benefits: Part B of the 1969 Act provided that claims filed on or before December 31, 1972, were to be processed by the Social Security Administration under the Department of Health, Education, and Welfare[1]; Part C of the 1969 Act provided that thereafter, i.e., "[o]n and after January 1, 1973," all claims for black lung benefits were to be relegated to the Department of Labor. Id.
 
 
 7
 This temporal division of claims, between "Part B" and "Part C," also governed liability for the benefits: Part B claim benefits were to be paid from the federal fisc; Part C benefits were to be paid pursuant to state workers' compensation statutes found by Labor to provide adequate black lung disability coverage, or, if the state programs were not approved, by the responsible mine operators or their successors (or by the federal government if such operators could not be found). Pub.L. No. 91-173, Secs. 411(a), 422(a)-(d), 83 Stat. 793, 796 (codified at 30 U.S.C. Sec. 921(a), 932(a)-(d) (1970)). As a practical matter, however, identifiable responsible mine operators were charged with all the Part C claim benefits granted to their employees as Labor did not approve any state workers' compensation statute for black lung disability benefit purposes. See 20 C.F.R. Sec. 722.152(b) (1990). The black lung benefit program under Part C was slated to end completely on December 30, 1976. Pub.L. No. 91-173, Sec. 422(e)(3), 83 Stat. 796, 30 U.S.C. Sec. 932(e)(3) (1970).[2]
 
 
 8
 The Black Lung Benefits Act of 1972, Pub.L. No. 92-303, 86 Stat. 150 (1972) (codified at 30 U.S.C. Secs. 901 et seq. (Supp. II 1973)) (the "1972 Act"), amended and substantially liberalized the 1969 Act. In particular, the 1972 Act, inter alia, made it easier to prove entitlement to benefits, expanded coverage under Part B to June 30, 1973,[3] and continued Part C in existence to December 30, 1981.
 
 
 9
 Burnsworth, a mine face foreman with Helen, first filed a claim for black lung benefits on January 15, 1973. This claim, a Part B claim by temporal definition, was reviewed by Social Security and was denied on September 12, 1973. On August 21, 1975, Burnsworth filed another claim with Social Security but, as it was a Part C claim, it was sent to Labor where it languished without decision.[4] On April 5, 1976, Burnsworth filed a third claim, and, shortly thereafter at the age of 70, retired from work in the mines. Labor administratively denied this last claim on March 24, 1977.
 
 
 10
 On March 1, 1978, Congress passed the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95-239, 92 Stat. 95 (1978) (codified at 30 U.S.C. Secs. 901 et seq.) (the "Reform Act"). Under the Reform Act, the standards for proving disability due to black lung were further substantially relaxed, and provision was made for indefinite continuation of Part C. The Reform Act also instructed Social Security and Labor to review all pending and previously denied claims on the basis of the new, liberalized standards. Labor was automatically to review Part C claims that had been filed with it and denied. The Secretary of Health and Human Services was directed to notify the claimants who had filed denied Part B claims with Social Security of their right to review by either Social Security or Labor. If a claimant elected Social Security review, the claim would be evaluated on the extant record; but if the claimant elected Labor review, the claimant could supplement the record. If granted on review, Part B claims were converted to Part C claims for the purposes of benefit liability. Regardless of whether Social Security or Labor made the review, Part B claims were to be reopened only "upon the request of the claimant...." Pub.L. No. 95-239, Sec. 15 (adding new Sec. 435(a)(1) to the 1969 Act) (codified at 30 U.S.C. Sec. 945(a)(1) (Supp. II 1979)) (emphasis added).
 
 
 11
 A companion to the Reform Act, the Black Lung Revenue Act of 1977, Pub.L. No. 95-227, 92 Stat. 11 (1978) (codified at 26 U.S.C. Sec. 4121 et seq.) (the "Revenue Act"), created the Black Lung Disability Trust Fund (the "Fund"). The Revenue Act provided that the Fund, financed by an excise tax on each ton of coal mined, would bear the administrative costs of the black lung benefits program, cover the federal government's existing Part C liability (for benefits attributable to mine operators who could not be found), and assume responsibility for paying black lung benefits where a miner's last employment in the industry ceased before January 1, 1970, thus shifting to the Fund responsibility for Part C claims made by miners who had stopped working in the coal industry before the promulgation of the 1969 Act. However, since mine operators remained liable for Part C claims made by miners whose employment in the industry continued after 1969, and because of the automatic conversion of granted Part B claims into Part C claims for benefits purposes, mine operators became liable for all benefits granted to post-1969 miners under the Reform Act's liberalized standards.
 
 
 12
 After passage of the Reform Act, Burnsworth received a letter from Social Security, and, almost immediately thereafter, another from Labor. The four-page letter from Social Security explained the changes in the law and attached a card for electing Social Security or Labor review. The Social Security letter informed Burnsworth,
 
 
 13
 If you wish your claim to be reviewed under the new law, you must request it.... You have up to six months from the date shown on the election card to request review unless you have a good reason for not doing so. [Emphasis in original.]
 
 
 14
 The Labor letter informed Burnsworth,
 
 
 15
 All claims filed with the Department of Labor that have not been approved for black lung benefits will automatically be reviewed under the new law.
 
 
 16
 Since you previously filed a claim with the Department, you do not have to file a new claim. We will automatically review your claim and contact you if additional information is needed in order to decide your case. Until we contact you, there is nothing that you need to do about your claim. We will appreciate your continued patience during this review process.[Emphasis in original.]
 
 
 17
 In light of these seemingly contradictory communications, Burnsworth did nothing. "I just thought," he testified, "well, it's just like everything else and I just laid [the card] aside." "I took for granted that everything was under control [and] in order and there was no need of me bothering anyone at the time."
 
 
 18
 On October 26, 1979, Labor informed Burnsworth that his benefits had been approved to be retroactive to the August 21, 1975, filing of his second Part C claim. Labor began paying Burnsworth's benefits, and notified Helen of its potential liability, which Helen timely controverted. Pursuant to Helen's contest, an administrative hearing was scheduled, but before it was held Helen withdrew its contest of Burnsworth's eligibility for benefits. Labor, however, continued to pay Burnsworth's benefits, apparently believing that Helen would eventually be liable for them.
 
 
 19
 Meanwhile, the liberalized standards of entitlement under the Reform Act began to wreak havoc in the coal industry. As the percentage of claims granted soared, the mine operators found themselves saddled with a massive, retroactive, unanticipated liability for Part C claims which their insurers refused to cover. See Lopatto, The Federal Black Lung Program: A 1983 Primer, 85 W.Va.L.Rev. 677, 693-94 (1983). Congress addressed this problem in the Black Lung Benefits Amendments of 1981, Pub.L. No. 97-119, 95 Stat. 1643 (1981) (codified at 30 U.S.C. Sec. 901 et seq.) (the "1981 Act"). The 1981 Act provided that mine operators were not liable for benefits on account of total disability due to pneumoconiosis
 
 
 20
 (2) which was the subject of a claim denied before March 1, 1978, and which is or has been approved in accordance with the provisions of section 945 of this title.
 
 
 21
 Pub.L. No. 97-119, Sec. 205(a)(1), 95 Stat. 1645, 30 U.S.C. Sec. 932(c) (1982) (emphasis added).
 
 
 22
 Thus, mine operators were relieved of liability for benefits granted under the new, liberalized standards of the Reform Act where those benefits had already been the subject of a "claim denied" on or earlier than February 28, 1978; the liability for these benefits, instead, was to be transferred to the Fund, the assets of which were supplemented by a further hike in the excise tax on coal.
 
 The 1981 Act further provided
 
 23
 that the term "claim denied" means a claim--
 
 
 24
 (1) denied by [Social Security]; or
 
 
 25
 (2) in which (A) the claimant was notified by [Labor] of an administrative or informal denial more than one year prior to [March 1, 1978] and did not, within 1 year from the date of notification of such denial, request a hearing, present additional evidence or indicate an intention to present additional evidence, or (B) the claim was denied under the law in effect prior to [March 1, 1978] following a formal hearing or administrative or judicial review proceeding.
 
 
 26
 Pub.L. No. 97-119, Sec. 205(b), 95 Stat. 1645, 30 U.S.C. Sec. 902(i) (1982).
 
 
 27
 None of these transfer provisions, however, relieved Helen from liability for Burnsworth's benefits: subsection 2(B) did not transfer liability to the Fund as Burnsworth's second Part C claim was not originally denied following a formal proceeding; subsection 2(A) did not transfer liability, for although Burnsworth's second Part C claim was originally denied administratively, the denial was on March 24, 1977, and thus not "more than one year prior to March 1, 1978," see 30 U.S.C. Sec. 902(i); and subsection (1) did not transfer liability as Burnsworth's Part B claim, though denied by Social Security, had not been subsequently granted. His Part B claim could not have been granted as Burnsworth never requested that claim to be reopened and reviewed.
 
 II. HELEN'S CLAIM
 
 28
 Nonetheless, after passage of the 1981 Act Helen, relying on regulations which Social Security and Labor had promulgated after the passage of the Reform Act in 1978 to implement the review process, contended it was entitled to have its liability for benefits transferred to the Fund. The regulations deal with situations such as Burnsworth's, where, prior to the Reform Act's passage, a claimant had had Part B and Part C claims denied. The Social Security regulation provides:
 
 
 29
 If the claimant does not respond to notification of his or her right to review by [Social Security] within 6 months of the notice (see Sec. 410.704(c)[5] unless the period is enlarged for good cause shown, the Office of Workers' Compensation Programs shall proceed under [Labor's] regulations at 20 C.F.R. Part 727 to review the claim originally filed with [Labor].
 
 
 30
 20 C.F.R. Sec. 410.705(c) (1990) (Emphasis added.)
 
 
 31
 Labor's regulation provides that where a claimant had had both a Part B and a Part C claim denied, but
 
 
 32
 d[id] not respond to notification of his or her right to review by [Social Security] within 6 months of such notice (see Sec. 727.104) unless the period is enlarged for good cause shown, the Secretary of Labor shall proceed under this Part to complete processing of the claim originally filed with [Labor].
 
 
 33
 20 C.F.R. Sec. 727.103(c) (1990) (Emphasis added.)[6] Helen argued to Labor, and again contends to us, that, under these regulations, it should be allowed to show that Burnsworth had "good cause" for not requesting review of his Part B claim within 6 months of notification of his right to seek such review. Helen believed that if Burnsworth had good cause, and if his claim filed with Social Security was therefore reopened, reviewed, and granted, its liability for Burnsworth's benefits from the second claim filed with Labor would be obviated and the liability for benefits from the claim filed with Social Security transferred to the Fund under Sec. 205(b)(1) of the 1981 Act. See 30 U.S.C. Sec. 902(i)(1) (1982 & 1988).[7] Helen's position, however, was rejected by an administrative law judge notwithstanding his conclusion that Burnsworth had good cause in not seeking the Part B review, because under administrative precedent the Part B claim was merged into the Part C claim, which was not transferable. This decision and order was affirmed by the Board of Review. Helen then brought the petition for review now before us.
 
 III. DISCUSSION
 
 34
 The foregoing is, then, the statutory, regulatory, factual and procedural background that we consider in deciding this matter. We are satisfied that while there can be no doubt that the evolution of the black lung benefits program presents a complicated picture, the proper resolution of this case ultimately is clear. Helen, of course, acknowledges that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Further, it does not deny that in 1978 the mine operators were essentially legal bystanders to the Reform Act's provisions by which miners were given the right to have their denied claims reviewed. Yet it maintains that it has subsequently become entitled to take advantage of these provisions and the regulations implementing them. Helen claims that after passage of the 1981 Act's transfer provisions it acquired a very real monetary interest in having Burnsworth's Part B claim reopened and reviewed, and that it therefore has standing to have the claim reopened by asserting "good cause" for Burnsworth's failure to timely request review.
 
 
 35
 While we do not agree with this formulation, we agree that Helen has standing. The administrative law judge and the Benefits Review Board respectively determined that liability for Burnsworth's benefits would not transfer to the Fund and that Helen would have to pay those benefits. Thus, Helen was "aggrieved" by the Board's determination, see 33 U.S.C. Sec. 921(c), incorporated by reference into 30 U.S.C. Sec. 932(a), and has suffered a direct economic injury from the administrative determinations. It therefore has a personal stake in this case and was warranted in invoking our jurisdiction and in seeking a remedy for itself. See Warth v. Seldin, 422 U.S. at 499-500, 95 S.Ct. at 2205. Accordingly, Helen has standing to argue that it may obtain review of the Part B claim by showing "good cause" for Burnsworth's failure to timely request review.
 
 
 36
 However, the fact that Helen has standing does not mean it is entitled to relief. We are satisfied that Congress did not intend that mine operators could take advantage of the review provision of the Reform Act for Part B claims. The plain language of the Reform Act provides that Part B claims are to be reopened only "upon the request of the claimant...." 30 U.S.C. Sec. 945(a)(1) (emphasis added). Significantly, the original version of the bill that became the Reform Act provided that Part B claims, like Part C claims, were to be reopened automatically. H.R. 4544, 95th Cong., 1st Sess. (1977), reprinted in H.R.Rep. No. 151, 95th Cong., 1st Sess. (1977). The requirement that "the claimant " request review for Part B claims was inserted into the final version of the bill. See H.R.Conf.Rep. No. 864, 95th Cong., 1st Sess. 20-21, reprinted in 1978 U.S.Code Cong. & Admin.News 237, 313-15. Clearly, then, "the claimant" alone was given the right and responsibility for requesting review of denied Part B claims. Indeed, inasmuch as the transfer provisions did not exist when the Reform Act was enacted, Congress could hardly have provided otherwise. See 30 U.S.C. Sec. 945(a)(1). See also 124 Cong.Rec. 2,331 (1978) (statement of Sen. Randolph) ("All denied part B claimants will be given the option of having their claims reviewed ... by [Social Security] or ... [Labor] ...") (emphasis added); id. 2,336 (statement of Sen. Byrd) ("The legislation also assures that miners previously denied black lung benefit payments will be permitted to have their claims reconsidered to determine if they are eligible") (emphasis added); id. 3,426 (statement of Rep. Perkins) ("Every ... claimant is absolutely entitled to a review ...") (emphasis added).
 
 
 37
 The regulations promulgated by Social Security and Labor under the review provisions of the Reform Act support this view. The right to seek reopening and review of Part B claims belongs to the claimant--it is "his or her right to review...." 20 C.F.R. Sec. 410.705(c), Sec. 727.103(c) (emphasis added). Thus, the claimant decides whether to exercise that right and where, as here, the claimant does not mail the election card back to Social Security within 6 months, "the claimant " is deemed to have waived review of the Part B claim. 20 C.F.R. Sec. 410.704(d), Sec. 727.104(b) (emphasis added). Inasmuch as these regulations were promulgated about 6 months after passage of the Reform Act, see 43 Fed.Reg. 34,781 (1978); id. 36,819, they are presumed to be a correct reflection of Congressional intent. See National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Therefore, unless we rewrite the law and the regulations, Helen cannot prevail, and that we will not do.
 
 
 38
 Furthermore, we reject Helen's argument that the administrative law judge's finding that Helen had "good cause" in not asking for the Part B review somehow satisfies the statutory requirement of a request for review by the claimant. The very regulations upon which Helen relies provide that "good cause" is good cause for an untimely request for review; it is not good cause for a failure to make a request for review. See 20 C.F.R. Sec. 410.705(c), Sec. 727.103(c) ("unless the period is enlarged for good cause shown ...") (emphasis added). Burnsworth has never requested review of his Part B claim and it is that request which under the Reform Act is a prerequisite that Congress explicitly imposed for the reopening of a Part B claim.
 
 
 39
 Finally, far from agreeing with Helen that the 1981 Act's transfer provisions somehow vested mine operators with the right to request the reopening of Part B claims, we hold that the transfer provisions reaffirmed the requirement that the request for reopening come from the claimant. The 1981 transfer provisions instruct that transfer of benefit liability to the Fund can only take place for claims which, inter alia, have "been approved in accordance with the provisions of section 945" of title 30, 30 U.S.C. Sec. 932(c)(2), and, as we have noted, 30 U.S.C. Sec. 945(a)(1) provides that before a previously denied Part B claim can be "approved" or even reviewed, "the claimant " must request that the claim be reopened. It seems clear that Congress, in incorporating 30 U.S.C. Sec. 945(a)(1) by reference into the 1981 transfer provision, intended that transfer of benefit liability would take place only for those claims not abandoned by the person to whom the claim belongs, the person for whom the black lung benefits program was created, i.e., the miner, "the claimant." We thus adhere to our holding in Krecota that a request for review of a Part B claim must come from the miner and not the operator.
 
 
 40
 Our conclusion is at least partially supported by Old Ben Coal Co. v. Luker, 826 F.2d 688 (7th Cir.1987). In Luker, as here, the miner had filed both a Part B and a Part C claim. The Part C claim was approved but the mine operator sought to have its liability for benefits transferred to the Fund by showing "good cause" for the miner's failure to timely request review of his Part B claim. In Luker the mine operator presented to the Benefits Review Board affidavits of the claimant (i.e., the miner's widow) that requested review of the denied Part B claim. The court treated this as the equivalent of a formal request for review of the denied Part B claim, and remanded the matter to the Board to determine whether there was "good cause" for the lateness of this request. In our case, we have no occasion to express a view on the propriety of treating a claimant's request to the Board as the equivalent of a formal request for review, as the Court of Appeals for the Seventh Circuit did. Here, there was no such involvement by the claimant. Moreover, we note that the Luker court rejected the mine operator's suggestion that it was unimportant whether a request had been made by the claimant. The court observed:
 
 
 41
 We do not accept this argument as a way around the Social Security regulations which require a specific election--whether by the formal election card or by some other means--to have the Part B claim reviewed. Under the controlling Social Security regulations, 20 C.F.R. Sec. 704, Luker must have made a timely specific election to have the Part B claim reviewed. We believe that to accept [the mine operator's] argument on this point would be to ignore the controlling regulations and with them the congressional intent to limit transfer to the number and type of claims already discussed.
 
 826 F.2d at 697 n. 5.[8]
 IV. CONCLUSION
 
 42
 In sum, we hold that, under 30 U.S.C. Sec. 945(a)(1), the right to request the reopening of a denied Part B claim belongs only to "the claimant," and, under the implementing regulations, only "the claimant" may request a finding of "good cause" for failure to seek timely review, see 20 C.F.R. Sec. 410.705(c), Sec. 727.103(c). Accordingly, there is no basis for Helen to become Burnsworth's surrogate and we will deny the petition for review.
 
 
 43
 BECKER, Circuit Judge, dissenting.
 
 
 44
 I agree with the majority's observation that the statutory background is complicated. I disagree with its conclusion that the meaning of the relevant statutory and regulatory language is plain. Therefore, in order to determine whether a mine operator may transfer liability for the black lung benefits of its former employee to the Black Lung Disability Trust Fund (the "Fund"), I find it necessary to delve further into the statutory background of the Black Lung Benefits Amendments of 1981 (the "1981 Amendments") than does the majority. In my view, the intent of Congress, which ultimately governs this case, can be discerned only from that part of the story behind the 1981 Amendments that the majority leaves untold.
 
 
 45
 The untold story compels several relevant conclusions. First, the true source of the 1981 Amendments, the agreement that the mine operators, their insurers, and the mineworkers' unions reached at Congress's behest in an effort to save the black lung benefits program from bankruptcy, and which Congress blessed by enacting it, clearly contemplated the transfer of claims such as that of Helen Mining Company's ("Helen Mining's") former employee, John Burnsworth, to the Fund. Additionally, it makes utterly no sense to make the transfer of liability from a mine operator to the Fund turn upon a request for transfer by a miner who already is receiving benefits and therefore has absolutely no interest in effecting this shift in liability--but that is what the majority does. It also is unrealistic to believe that Congress intended such a strange result. I therefore believe that responsibility for the claim at issue should have been transferred to the Fund and that the majority has reached the wrong result in this case.
 
 
 46
 From my reading of Director, Office of Workers' Compensation Programs v. Quarto Mining Co., 901 F.2d 532 (6th Cir.1990), the Sixth Circuit reached a result in direct opposition to that which the majority reaches today. Further, as I read Old Ben Coal Co. v. Luker, 826 F.2d 688 (7th Cir.1987), the Seventh Circuit arrived at a holding that effectively is irrelevant to that of the majority here. Because I find the majority's analysis of the relevant statutory framework less than persuasive and believe that the result reached by the Sixth Circuit is more consistent with the intent behind the 1981 Amendments, I respectfully dissent.
 
 
 47
 I. DOES THE APPLICABLE STATUTORY AND REGULATORY LANGUAGE, BY
 
 
 48
 ITS PLAIN MEANING, FORECLOSE HELEN MINING'S TRANSFER EFFORT?
 
 
 49
 I have no quarrel with the majority that Helen Mining has standing to challenge the Benefits Review Board's affirmance of the administrative law judge's decision denying transfer of Burnsworth's claim to the Fund.[1] I therefore begin with an assessment of the majority's conclusion that the applicable statutory and regulatory language by its plain meaning forecloses Helen Mining's transfer effort. I believe that conclusion to be unsound.
 
 
 50
 The majority begins its analysis of 30 U.S.C. Sec. 932(c)(2), the key transfer provision of the 1981 Amendments, by quoting the statutory language. See Majority Op. at 1273. The majority, however, stops parsing this ostensibly decisive language when it encounters the term "claim denied," quickly concluding that liability for a miner's claim is to be transferred to the Fund if the claim is a "claim denied." See id., 1273. Having drawn this first conclusion, the majority immediately shifts its attention to 30 U.S.C. Sec. 902(i)--the provision of the 1981 Amendments that defines "claim denied." See id. The majority then hastily draws the conclusion that Burnsworth's various Part B and Part C claims do not clearly fall within the ambit of any of the definition's subsections. With this second element of its reductive syllogism in place, the majority concludes that liability for Burnsworth's benefits cannot transfer to the Fund, because, most relevantly, "Burnsworth's Part B claim, though denied by Social Security, had not been subsequently granted." Id. at 1273.
 
 
 51
 If examined with more deliberation, however, the statutory language upon which the majority relies actually undermines its conclusion. The majority fails to observe that the transfer provision that it quotes does not simply conclude with the statement that no benefit for a black lung claim shall be payable by a mine operator if the benefit "was the subject of a claim denied before March 1, 1978." 30 U.S.C. Sec. 932(c)(2). The provision concludes, rather, with the statement that a benefit shall not be payable by a mine operator if it was the subject of a claim denied before March 1, 1978, "which is or has been approved in accordance with the provisions of section 945 of this title." Id. (emphasis added). The emphasized language of this clause, over which the majority glides, thus clearly contemplates that liability for a black lung claim may transfer to the Fund not only if the claim has, at some point in the past, been approved in accordance with the provisions of 30 U.S.C. Sec. 945, but also if the claim is, at some point in the future, so approved.
 
 
 52
 When this clause of the transfer provision is borne in mind, the statutory definition of "claim denied" is anything but dispositive of the issue whether liability for Burnsworth's black lung benefits may transfer to the Fund. As the majority notes, subsections (2)(A) and (B) of the section of the 1981 Amendments defining "claim denied," 30 U.S.C. Sec. 902(i), do not, by their terms, apply to Burnsworth's claim and hence to Helen Mining's transfer effort. See Majority Op. at 1273, 1274. The only subsection of this definitional provision that is relevant to the transfer issue that Helen Mining has raised is subsection 902(i)(1), which simply states that "[f]or the purposes of [the transfer provision of the 1981 Amendments] ..., the term 'claim denied' means a claim ... denied by the Social Security Administration." 30 U.S.C. Sec. 902(i). This subsection--far from dictating the conclusion that, because Burnsworth's Part B claim was not subsequently granted by the Social Security Administration (the "SSA"), liability for his benefits may not transfer to the Fund--is facially mute on the transfer issue. When contextually linked to the clause of the transfer provision that envisions prospective, as well as retrospective, approval of the transfer of liability for benefits to the Fund, moreover, this definitional subsection suggests that Burnsworth's claim, at some unspecified future point, actually may transfer.
 
 
 53
 A close reading of the 1981 Amendments' transfer provision and definition of "claim denied" requires, at the very least, immediate resort to 30 U.S.C. Sec. 945(d), the provision of the Black Lung Benefits Reform Act of 1977 (the "1977 Reform Act") in accordance with which, the 1981 transfer provision states, a claim must be approved in order to transfer to the Fund. See 30 U.S.C. Sec. 932(c)(2). The provision states, in pertinent part, that
 
 
 54
 [t]he Secretary of Health and Human Services shall promptly notify each claimant who has filed a claim for benefits under part B of this subchapter and whose claim is either pending on March 1, 1978, or has been denied on or before that date, that, upon the request of the claimant, the claim shall be either--
 
 
 55
 (A) reviewed by the Secretary of Health and Human Services ...; or
 
 
 56
 (B) referred directly by the Secretary of Health and Human Services to the Secretary of Labor
 
 
 57
 ....
 
 
 58
 30 U.S.C. 945(a)(1).
 
 
 59
 Read in the context of the 1981 Amendments, section 945 only compounds statutory ambiguity on the issue whether Helen Mining may effect a transfer of Burnsworth's claim to the Fund. The language of section 945 clearly provides for a review of previously denied claims--but a review that already was to have taken place by the time that the 1981 Amendments were enacted. In the context of the 1981 transfer and definitional provisions, the most logical interpretation of the language of section 945 might appear to be that Burnsworth's originally denied Part B claim would be eligible for transfer only if, pursuant to his request, the Secretary of Health and Human Services had in the past reviewed (and approved) it. This is not a viable contextual interpretation of section 945, however, because it flies in the face of the transfer provision, which speaks of the transfer of a claim "which is"--i.e., in the present or the future--approved in accordance with the provisions of section 945. See 30 U.S.C. Sec. 932(c)(2). Neither the transfer provision nor the definition of "claim denied" in the 1981 Amendments explains how a claim, such as Burnsworth's, which has been denied by the SSA, is at present or in future to be approved in accordance with section 945, which establishes a plan for claim reviews that already has been implemented.
 
 
 60
 I believe that because the majority fails carefully to juxtapose the language of section 945 with the language of the 1981 transfer provision that references this section, it erroneously: (1) makes much of Congress's 1977 substitution, in section 945, of the requirement that the claimant request review of a Part B claim that previously had been denied in place of language in an earlier draft of the section that provided that Part B claims, like Part C claims, were automatically to be reviewed; and (2) arrives at the unwarranted conclusion that Congress, in 1981, "did not intend that mine operators could take advantage of the review provision of the Reform Act for Part B claims." See Majority Op. at 1275. For, if the language of section 945 is read in the immediate context of the 1981 transfer and definitional provisions, the election requirement of this section scarcely appears to clarify the statutory ambiguity as to who may effect the present or future transfer of a claim--and how this transfer may be accomplished. As the majority itself notes, "inasmuch as the transfer provisions did not exist when the Reform Act was enacted, Congress could hardly have provided otherwise" than for elected review at the behest of a claimant. Majority Op. at 1275. The language of this 1977 provision also fails to dictate the conclusion--plainly or otherwise--that Congress in 1981 intended that the mine operators could not take advantage of the 1977 provisions. The language of section 945, coupled with the language of the transfer provisions, points, rather, to a gap in the black lung benefits legislation, which, if not clearly bridged by the regulations construing these provisions, necessitates a closer examination of the legislative history of the 1981 Amendments to discern the controlling Congressional intent.
 
 
 61
 Like the majority, I regard the SSA and Department of Labor (the "DOL") regulations construing the election requirement of section 945 as potentially resolving any ambiguity that the 1981 transfer provision, in juxtaposition with this 1977 provision, creates as to who may transfer a claim to the Fund and by what means. I diverge from the majority, however, in my reading of these regulations.
 
 
 62
 As the majority emphasizes, both the SSA and the DOL regulations implementing the election requirement in the wake of the 1977 Reform Act provide that a claimant who previously has had both Part B and Part C claims denied will lose the right to review of the denied Part B claim if he or she "does not respond to notification of his or her right to review [by the SSA] ... within 6 months ... unless the period is enlarged for good cause shown." 20 C.F.R. Sec. 410.705(c) (1990); 20 C.F.R. Sec. 727.103(c) (1990); see also Majority Op. at 1273-1274. The majority, through the determinative prism of its conclusion that the language of the 1981 Amendments forecloses Helen Mining's transfer effort, reads this regulatory language solely to mean that a showing of good cause functions to enlarge the period in which a claimant may exercise the right to have a denied Part B claim reviewed. See Majority Op. at 1276. I cannot conclude, however, that the language of these regulations is, by its plain meaning, so definite. Particularly in the larger temporal context of the 1981 Amendments, the "period" that may be enlarged by a showing of good cause may refer not only (and narrowly) to the period in which a claimant may elect review, but also (more broadly and simply) to the period in which a claim subject to transfer may be reviewed. "Period" may also refer to the period, enlarged for good cause, in which a claimant retains a right of review that he or she may or may not personally have to exercise in order for a transfer of benefit liability to the Fund to be effected.[2]
 
 
 63
 Because I believe that the language of the regulations construing the election requirement of the 1977 Reform Act is more indeterminate than the majority would have it, I also cannot conclude that the regulation construing the 1981 transfer provision resolves any ambiguities in the statute and mandates that Helen Mining may not, upon a showing of good cause, effect a transfer of Burnsworth's claim to the Fund. As the majority notes, Majority Op. at 1274 n. 6, the regulation accompanying the transfer provision provides that
 
 
 64
 No claim filed with and denied by the Social Security Administration is subject to the transfer of liability provisions unless a request was made by or on behalf of the claimant for review of such denied claim under [30 U.S.C. Sec. 945]. Such review must have been requested by the filing of a valid election card or other equivalent document with the Social Security Administration in accordance with [30 U.S.C. Sec. 945(a) ] and its implementing regulations....
 
 
 65
 20 C.F.R. Sec. 725.496(d) (1990). To my mind, this regulation simply directs the statutory constructionist back to the language of section 945 and of its implementing regulations. As I have explained previously, I do not believe that the language either of this provision or of its implementing regulations fills in an interstice in the black lung statutory scheme that leaves unresolved the issue whether, upon a showing of good cause, Helen Mining may effect a transfer of liability for Burnsworth's claim to the Fund.
 
 
 66
 I am mindful that "where [Congress's] will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.' " Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 3249, 73 L.Ed.2d 973 (1982) (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); see also Malloy v. Eichler, 860 F.2d 1179, 1183 (3d Cir.1988) ("Where the language of the statute is clear, only 'the most extraordinary showing of contrary intentions' justif[ies] altering the plain meaning of a statute." (citation omitted)). In contrast to the majority, I simply cannot conclude that Congress has, in the statutory framework that controls this case, clearly expressed its will as to how the issue that Helen Mining presents ought to be resolved. I believe, rather, that this case highlights a lacuna in Congress's black lung benefits legislation and that it is "the very touchstone of judicial responsibility in dealing with such [a] statutory [interstice] ... to ascertain, to the best extent possible, the Congressional intent, and to interpret the statute in light of the statutory scheme." Glus v. G.C. Murphy, 629 F.2d 248, 263 (3d Cir.1980) (Sloviter, J., dissenting) (elaborating upon the differing judicial functions of creating federal common law and interpreting statutes), vacated and remanded sub nom. Retail, Wholesale and Department Store Union, AFL-CIO v. G.C. Murphy Co., 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981), rev'd in part on remand, 654 F.2d 944 (3d Cir.1981); see also United States v. Vastola, 915 F.2d 865 (3d Cir.1990) ("Where there are statutory interstices in the sense that the statute's language does not explicitly resolve an issue which has arisen in the application of the statutory scheme, a court obviously has the power to decide the issue consistently with the legislative intent."). It is to this task of ascertaining the Congressional intent behind the 1981 Amendments and analyzing the transfer issue that Helen Mining has raised in the light of the statutory scheme that I next turn.
 
 II. THE OTHER HALF OF THE LEGISLATIVE STORY
 
 67
 As the majority observes, the Black Lung Benefits Reform Act of 1977 greatly liberalized the eligibility criteria for black lung benefits, wreaking havoc in the coal industry. See Lopatto, The Federal Black Lung Program: A 1983 Primer, 85 W.Va.L.Rev. 677, 696-98 (1983). Insurance companies increasingly refused to cover the new, numerous, and unanticipated operator liabilities arising from the 1977 Reform Act's liberalized standards. See id. These liabilities included liabilities for claims for which, prior to the 1977 legislation, the federal government would have been presumed liable. See H.R.Rep. No. 1410, 96th Cong., 2d Sess. 3 (1980) (1977 amendments to black lung benefits program rendered operators and, in default, the Fund, liable for claims approved under new review provisions regardless of whether claims originally were filed in period of presumed federal liability). Litigation between mine operators and their insurers followed, and, as the insurance companies won coverage lawsuits, the basic funding mechanism created by the 1977 Reform Act was jeopardized. See Lopatto, supra, at 697-700.
 
 
 68
 The majority acknowledges that the problems in the coal and coal insurance industry created by the 1977 Reform Act's liberalized standards spurred the 1981 Amendments. The majority, however, fails to take note either of the unusual process by which the 1981 Amendments evolved or of Congress's intent in enacting them. Indeed, the absence of any legislative records of a conference or proposed bills preceding enactment of the 1981 Amendments points to the considerable role that mine operators, insurers, and labor played in evolving this legislation. Although the 1981 Amendments appear mainly to have been drafted by the DOL, they clearly constitute a "consensus package" arrived at by these various groups in an effort to preserve black lung benefits for afflicted miners and to ensure the continued solvency of both mine operators and the Fund. See id. at 677.
 
 
 69
 That the 1981 Amendments constitute an accommodation reached by mine operators, their insurers, and labor is overwhelmingly borne out by records of the House and Senate debates on this legislation. See 127 Cong.Rec. 31,508-13 (1981) (1981 Amendments enjoy support of "the administration and a broad coalition of coal producers, mineworkers, and others affected by the legislation") (statement of Rep. Rostenkowski), (1981 Amendments represent "a compromise on the part of almost all the interested parties") (statement of Rep. Conable), (1981 Amendments "preserve the program revisions which have been worked out with careful consideration of all interests involved and ... have the support of coal operators, insurance companies, and the United Mine Workers") (statement of Rep. Benedict), 127 Cong.Rec. at 31,958, 31,965, 31,979-80 (1981 Amendments are supported by "alliance" comprising the administration, industry, insurers, and unions) (statement of Sen. Chafee), (1981 Amendments have been endorsed by "the administration, the coal industry, and the United Mine Workers" and represent "much deliberation and compromise by all parties concerned") (statement of Sen. Ford), (1981 Amendments represent culmination of "a long counseling period" to promote consensus among parties, such as the National Coal Association, the United Mine Workers, and the American Insurance Association, "recognizing the human element and the financial considerations which are involved") (statement of Sen. Randolph).
 
 
 70
 The 1981 Amendments doubled the excise tax on coal (largely paid by local purchasing electric companies) that financed the Fund, and transferred liability from mine operators to the Fund for a number of black lung claims that the SSA and the DOL originally denied but, under the 1977 Reform Act, subsequently approved. See generally 127 Cong.Rec. at 31,506, 31,508-13. The nub of the legislative package as it pertains to this case is that it relieved mine operators (and their insurance carriers) of the bulk of the unanticipated financial responsibility for black lung benefits that resulted from applying the 1977 Reform Act's liberalized criteria to previously denied claims. See id.; see also 127 Cong.Rec. at 31,958, 31,960-61. The 1981 Amendments provided that the burden for these benefits was to be shouldered by the Fund, financed indirectly by the new tax.
 
 
 71
 As is evidenced by the relative brevity of the legislative debate on the 1981 legislative accord--a debate in which the transfer provisions notably were not touched upon--Congress virtually rubber stamped the accommodation reached by the mine operators, their insurers, and labor. See 127 Cong.Rec. at 31,506, 31,958-82. As is explained in the margin, Congress appears, in particular, to have rubber stamped the accommodation that these parties reached concerning the transfer provisions in the 1981 Amendments.[3] It is clear, moreover, that Congress, in enacting this accommodation, was motivated by two main concerns.
 
 
 72
 One obvious concern was to return the Fund to solvency. See Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, 97th Cong., 1st Sess., Report and Recommendations on Black Lung Disability Trust Fund (Comm. Print 1981) [hereinafter Report on the Fund]; 127 Cong.Rec. at 31,506-14, 31,958-82. The other concern, which takes precedence in the House Committee on Education and Labor's Report on the 1981 Amendments, was to "correct an inequity that occurred out of the 1977 Amendments to the Black Lung Benefits Act.... [that] impacts significantly and adversely on coal operators and their commercial insurers"--namely, their unanticipated liability for claims granted under the liberalized standards of the 1977 Reform Act. H.R.Rep. No. 1410, 96th Cong., 2d Sess. at 1;[4] see also Report on the Fund, supra, at 28 (transferring liability for claims previously denied and subsequently reopened and approved under standards of the 1977 Reform Act would "rectify the inequity of making mine operators liable for claims that were approved under retroactively-applied benefit entitlement standards").
 
 
 73
 This is the legislative story behind the 1981 Amendments that the majority fails to read and apply. I believe, as I discuss next, that it is only within the overarching context of this story that the issue whether Helen Mining may effect a transfer of Burnsworth's claim to the Fund can, within the subcontext of the statutory scheme, be correctly resolved.
 
 
 74
 III. THE TRANSFER ISSUE IN THE LIGHT OF THE LEGISLATIVE
 
 HISTORY AND THE STATUTORY SCHEME
 
 75
 The issue before us, set against the background that I have discussed at length, is whether it is consistent with the statutory scheme of the black lung benefits program to permit Helen Mining to effect a transfer to the Fund of liability for a claim (1) of the type that Congress intended should transfer to the Fund, and (2) as to which good cause has been found for the claimant's failure timely to elect the review on which a transfer ordinarily is conditioned. I conclude not only that it is consistent with the statutory scheme to permit mine operators, such as Helen Mining, to effect the transfer to the Fund of claims such as Burnsworth's, but also that it would be patently unreasonable, in light of this statutory scheme, to prohibit operators from seeking transfers of these sorts of claims.
 
 
 76
 Burnsworth's original Part B claim, which was denied by the SSA prior to March 1, 1978, clearly is the type of claim that (if approved under the liberalized criteria of the 1977 Reform Act) the mine operators, their insurers, and, ultimately, Congress, intended should transfer to the Fund.[5] Under the SSA and DOL regulations implementing the 1977 Reform Act, moreover, if a claimant such as Burnsworth, with duplicate Part B and Part C claims, requested review of his Part B claim (or had the failure timely to request review excused for good cause), the claimant's Part B claim clearly would transfer, thereby extinguishing the operator's potential liability for his Part C claim. See 20 C.F.R. Secs. 410.705(c) & 727.103(c). SSA's and DOL's twin regulations governing duplicate claims strongly suggest that these agencies viewed duplicate claims, such as Burnsworth's, as retroactive, unanticipated liabilities that Congress intended should be transferred to the Fund.
 
 
 77
 It is central to emphasize that the administrative law judge (the "ALJ") determined, based on Burnsworth's own testimony, that good cause existed for Burnsworth's failure to file an election card with the SSA for review of his Part B claim. As the majority notes, the ALJ ultimately concluded that Helen Mining could not effect a transfer of liability to the Fund for the benefits that the DOL granted to Burnsworth under Part C. See Majority Op. at 1274 n. 7. The ALJ, however, based this ultimate conclusion, as did the Benefits Review Board its affirmance, on Chadwick v. Island Creek Coal Co., 7 Black Lung Rep. (MB) 1-833 (Ben.Rev.Bd.1985)--a decision that I believe the majority, agreeing with the Seventh Circuit, rightly rejects. See Majority Op. at 1275 n. 7 (citing Old Ben Coal Co., 826 F.2d at 693-98).
 
 
 78
 I therefore believe that the majority mischaracterizes the ALJ's decision as a rejection of Helen Mining's "position" that a showing of good cause obviates the need for Burnsworth personally to seek the transfer of liability for his benefits to the Fund. Id. at 1274-1275. I also believe that the majority errs in thus glossing over the ALJ's good cause determination. See id. at 1274-1275. This factual determination is entitled to considerable deference and may be set aside only if it is not supported by substantial evidence. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1950); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.1988). Although the issue that faces us primarily is one of statutory interpretation, I nonetheless think that this "good cause" determination is entitled to far more attention than the majority accords to it.
 
 
 79
 As I repeatedly have emphasized, the transfer provision of the 1981 Amendments, 30 U.S.C. Sec. 932(c)(2), provides that liability for a black lung claim may transfer to the Fund not only if it has, in the past, been approved by the SSA, but also if it is, in the present or in the future, so approved. The SSA's "good cause" regulation, 20 C.F.R. Sec. 410.704(d), which governs approval for transfer in the absence of a timely election, functions as an integral part of this transfer provision. Logically, the present or future "good cause" transfer of a claim to the Fund, for which the transfer provision and this regulation provide, would only be sought by a mine operator. Indeed, if Helen Mining is not free to raise this claim with us, it is difficult to see how transfer cases involving duplicate claims ever could be litigated. Because the primary interest of claimants such as Burnsworth is eliminated upon the approval of their Part C claims and the receipt of benefits, duplicate claimants have no subsequent incentive to elect review and to press good cause issues personally. Mine operators, such as Helen Mining, faced with unanticipated liabilities for Part C claims, which their insurance carriers may refuse to cover, continue to have, of course, a considerable stake in pressing good cause issues and seeking the transfer of these claims.
 
 
 80
 To my mind, it is illogical to construe a statutory scheme that provides for present and future "good cause" transfers of claims to the Fund so as to: (1) foreclose transfers instigated by the only parties who have an interest in effecting them; and (2) permit transfers only by parties who have no interest in seeking them. This construction of the statutory scheme seems to me to fly in the face of the long-standing rule of statutory construction that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative intent are available." Griffin, 458 U.S. at 575, 102 S.Ct. at 3252 (citing United States v. American Trucking Ass'ns., Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), and Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340 (1940)); see also Walling v. American Stores Co., 133 F.2d 840, 844 (3d Cir.1943) ("[W]e should not be justified in a literal application of [statutory] words where they would lead to a result plainly at variance with the policy of the legislation as a whole.").
 
 
 81
 Yet this, I conclude, is the construction of the statutory scheme at which the majority arrives today. I believe that it would show the appropriate deference to the ALJ's finding of good cause in this case and would be more consistent both with the black lung statutory scheme, in general, and with the 1981 Amendments, in particular, to hold that the establishment of good cause for a claimant's failure to request the reopening of a denied Part B claim during the six-month statutory period functions as a surrogate for a transfer request personally filed by a claimant.
 
 
 82
 It is important to note that such a holding would not implicitly adopt for claimants such as Burnsworth, with concurrently reviewable Part B and Part C claims, an "automatic election," effectively waiving the statutory and regulatory requirement of a claimant's timely request for review of a Part B claim (and, in its absence, a showing of good cause).[6] Permitting a showing of good cause to obviate the need for a claimant's personal request that a Part B claim be reopened does not endorse such an "automatic" or "implicit" election theory, because it is possible that a duplicate claimant, such as Burnsworth, would not meet the good cause criteria.[7] Further, as my previous analysis suggests, I believe that it would be more consistent with the enacted accommodation reached by mine operators, their insurers, and labor, as well with Congress's intent to relieve mine operators of unanticipated liability for claims such as Burnsworth's, to hold that the establishment of good cause functions as a surrogate for a transfer request personally filed by the claimant.[8]
 
 
 83
 In addition, I disagree with the majority that its conclusion "is at least partially supported by Old Ben," 826 F.2d at 688, that Quarto, 901 F.2d at 532, "holds little more than Luker," and that both decisions are "inapposite in a case in which the claimant remained uninvolved in the transfer dispute." Majority Op. at 1277, 1277 n. 8. Although I believe that the holding of Old Ben is, as the majority ultimately concludes, irrelevant to this case, I do not believe that the Seventh Circuit's decision in Old Ben by any means supports the majority's decision here. I believe, however, that the Sixth Circuit in Quarto reached a decision that is highly relevant to cases, such as this one, in which the claimant remains uninvolved in the transfer dispute, and that the holding in Quarto directly contravenes that which the majority reaches today, thus creating a circuit split.
 
 
 84
 In Old Ben, the court briefly considered, as the majority notes, whether good cause had been established for the claimant's failure to request review, under the liberalized criteria of the 1977 Reform Act, of his previously denied Part B claim. 826 F.2d at 688. In addressing this issue, the Old Ben court tersely and by no means explicitly inquired whether the affidavit from the widow of the duplicate claimant, requesting that the SSA again review her late husband's Part B claim, sufficed to reopen the claim. See id. at 697. In the footnote pertaining to the good cause issue, from which the majority quotes at length, the Old Ben court, prior to concluding that the controlling regulation had required the claimant to make a timely and specific election in order to have his Part B claim reviewed, considered an argument involving a variation of the fallacious "automatic election" theory that I previously have discussed. See id. at 697 n. 5. The Old Ben court observed at the outset in this footnote that the operator had contended that the claimant, by pursuing the automatic review of his Part C claim, "in effect elected by the simplest means to obtain DOL review" and that therefore "it was not necessary for [the claimant] to submit a formal election card to obtain review of his denied Part B claim." Id. The Old Ben court considered the operator's argument, in other words, that a passive election of review of a Part C claim, under the liberalized criteria of the 1977 Reform Act, constituted an implicit and automatic election for review of a previously denied Part B claim.
 
 
 85
 It was in this context that the Old Ben court made the statement that the majority quotes, asserting, inter alia, "[w]e reject this argument as a way around the SSA regulations which require a specific election--whether by formal election card or by some other means--to have the Part B claim reviewed." Id. This was the "argument" by the operator that the Seventh Circuit was rejecting in the passage quoted by the majority, see Majority Op. at 1277, and rightly so, because it flies in the face of both the statutory and regulatory language requiring the specific election of review of a denied Part B claim absent a showing of good cause. See 30 U.S.C. Sec. 945(a)(1); 20 C.F.R. Secs. 410.704 & 410.705(d). The Old Ben court simply did not speak to the issue, either in the footnote quoted by the majority or elsewhere in its opinion, whether a mine operator may, without the personal involvement of the claimant, seek to establish good cause for the claimant's failure timely to request review of a denied Part B claim and thereby to transfer liability for the claimant's benefits to the Fund. I therefore believe that the majority misconstrues and erroneously relies upon this quoted statement, in particular, and upon the Old Ben opinion in general, in concluding that the Seventh Circuit rejected the contention that a claimant's personal involvement in seeking the transfer of an operator's liability is unimportant. I conclude, rather, that the Seventh Circuit's opinion in Old Ben neither supports nor undermines but simply is irrelevant to the majority's opinion on this issue.
 
 
 86
 In contrast, in my opinion it is clear that the Sixth Circuit in Quarto faced and decided the issue whether, based upon the establishment of good cause for a claimant's failure timely to request review of a Part B claim, an operator may effect a transfer of liability for the claimant's benefits to the Fund. As the majority observes, the Quarto court noted in passing that the claimant joined in the operator's motion to be dismissed from liability under the 1981 Amendments. 901 F.2d at 534. The claimant's joinder in the operator's motion, however, appears in no way to have driven the Sixth Circuit's outcome in Quarto. The Sixth Circuit clearly stated that the issue before it compelled "the consideration of the consequences of a total lack of notice to the claimant on that claimant's ability to reopen a Part B claim and the operator's ability to transfer its liability to the trust fund." Id. at 537 (emphasis added). The Sixth Circuit, moreover, framed its holding in Quarto as follows: "We hold ... that where the claimant has failed to receive an election card, that claimant's presentation of that issue or the operator's raising of the transfer liability issue at a formal disability hearing suffices as the legitimate filing of a Part B claim. Id. (emphasis added).[9]
 
 
 87
 I therefore cannot agree with the majority that the Quarto court in substance held that a joint motion by a claimant and an operator before an ALJ to transfer liability for the claimant's benefits--and only such a joint motion--is "tantamount to a formal request to Social Security that [a] Part B claim be reopened" and sufficient to effect the transfer of the operator's liability to the Fund. Majority Op. at 1277 n. 8. I also cannot conclude that the Sixth Circuit's holding in Quarto is inapposite in cases in which claimants remain uninvolved in the transfer dispute or that Quarto's holding stands in anything other than direct opposition to the holding that the majority arrives at today.
 
 IV. CONCLUSION
 
 88
 In sum, I conclude, in contrast to the majority, that a deliberative reading of the statutory and regulatory language governing the black lung benefits program reveals an interstice in the statutory scheme on the question whether an operator, such as Helen Mining, may, through a showing a good cause for a duplicate claimant's failure to elect review of a Part B claim, effect a transfer to the Fund of liability for the claimant's benefits. I believe that this interstice necessitates recourse to the legislative story behind the relevant statutory provisions--a story that the majority unfortunately has failed to ponder and apply.
 
 
 89
 In my view, this statutory interstice necessitates careful analysis of the governing statutory provisions and their implementing regulations, not only within the overarching context of the legislative story behind them, but also within the context of the general statutory scheme. Such an analysis, to my mind, demonstrates that the majority's conclusion that the statute and the regulations prohibit Helen Mining from effecting a transfer to the Fund of liability for Burnsworth's benefits is both illogical and in contravention of clear Congressional intent.
 
 
 90
 I would thus arrive at the result that I conclude the Sixth Circuit reached in Quarto and would hold that an operator's establishment of good cause for a claimant's failure timely to request the reopening of a denied Part B claim functions as a surrogate for a transfer request personally filed by a claimant. To the extent that such a holding would require us to overrule our earlier decision in Rochester & Pittsburgh Coal Co. v. Krecota, 868 F.2d 600 (3d Cir.1989), I believe that the legislative and statutory analysis, in which this case calls upon us to engage, requires that we do so.
 
 
 91
 I respectfully dissent.
 
 
 
 *
 The Honorable Robert F. Kelly, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Pursuant to the Department of Education Organization Act, Pub.L. No. 96-88, Sec. 509, 93 Stat. 668, 695 (1979) (codified at 20 U.S.C. Sec. 3508 (1988)), the Department of Health, Education, and Welfare was redesignated the Department of Health and Human Services
 
 
 [2]
 It was expected that the states would assume responsibility in their respective workers' compensation programs for miners who contracted the disease "in the future." H.R.Rep. No. 563, 91st Cong., 1st Sess., reprinted in 1969 U.S.Code Cong. & Admin.News 2503, 2516
 
 
 [3]
 Part B was technically extended until December 30, 1973, but a "transition period" was provided whereby all Part B claims filed from July 1, 1973, to December 31, 1973, were tendered to Labor and treated as Part C claims. Pub.L. No. 92-303, Sec. 7, 86 Stat. 156-157, 30 U.S.C. Sec. 925 (Supp. II 1973)
 
 
 [4]
 As of September of 1977, Labor had apparently "failed to make even an initial claim determination in 50 percent of the cases filed." 123 Cong.Rec. 29,847 (1977) (statement of Rep. Drinan)
 
 
 [5]
 So in original. Should probably read, "Sec. 410.704(d)." See n. 6 infra
 
 
 [6]
 Social Security regulations also provide that
 [i]f a request for review [of a denied Part B claim] by [Social Security] or [Labor] is not received by [Social Security] within 6 months from the date the notice is mailed, the claimant shall be considered to have waived the right of review ... unless 'good cause' can be established for not responding within this time period.
 
 
 [20]
 C.F.R. Sec. 410.704(d)
 Similarly, Labor regulations provide that, for Part B claims,
 [i]f there is no response to notification [of the right to review by Social Security] ... within 6 months from the date notice is sent, unless the period is enlarged for good cause shown, the claimant shall be considered to have waived the right to review by [Social Security].
 
 
 [20]
 C.F.R. Sec. 727.104(b)
 Finally, in 20 C.F.R. Sec. 725.496, Labor provides, in pertinent part, that
 [n]o claim filed with and denied by [Social Security] is subject to the transfer of liability provisions unless a request was made by or on behalf of the claimant for review of such denied claim under section 435 [30 U.S.C. Sec. 945]. Such review must have been requested by the filing of a valid election card or other equivalent document with [Social Security] in accordance with section 435(a) [30 U.S.C. Sec. 945(a) ] and its implementing regulations at 20 CFR 410.700-410.707.
 
 
 [20]
 C.F.R. Sec. 725.496(d)
 In its brief and in oral argument, Helen explicitly foreswore any challenge to the validity of the regulations requiring that an election card be mailed back to Social Security within 6 months before Part B claims could be reviewed. We therefore do not have occasion to consider the validity of the regulations.
 
 
 [7]
 Helen advanced this theory to Labor as the reason why its liability for Burnsworth's benefits should be transferred to the Fund. Labor transferred the case to an administrative law judge and asserted before him that he did not have authority to make a "good cause" determination. In a Decision and Order issued July 28, 1987, however, the judge overruled this objection and found, at Helen's urging, that there was "good cause" for Burnsworth not sending in the election card since the Social Security and Labor letters taken together were confusing. Nevertheless, citing Chadwick v. Island Creek Coal Co., 7 Black Lung Rep. (MB) 1-883 (Ben.Rev.Bd.1985), aff'd in banc, 8 Black Lung Rep. (MB) 1-447 (Ben.Rev.Bd.1986), the judge held that Helen's liability for the claim filed with Social Security could not be transferred to the Fund. Helen then appealed to the Benefits Review Board. Chadwick, a Benefits Review Board decision, holds that a Part B claim, for which a claimant has elected review, merges by operation of law with a Part C claim so that the Part B claim is not transferable to the Fund if the Part C claim is not transferable to the Fund
 The Director asserted before the Board that the judge's determination that liability for Burnsworth's benefits could not transfer was correct--not because of Chadwick but, "since [a] claimant is required to specifically elect review of [a] previously denied claim with ... [Social Security] under Part B of the Act...." (Emphasis added.) On April 28, 1989, slightly more than three months after we decided Krecota, the Board affirmed on the basis of Chadwick.
 In this court, citing Krecota, the Director again asserts that it is the claimant and not the mine operator who can request review of a claim. In light of the fact that the Director specifically asserted to the Board that the claimant must specifically request review of a Part B claim for liability to transfer, we find that the Director's right to put forward the "Krecota" issue here was not waived through failure to raise it before the Board. We therefore reject the suggestion in Helen's brief on rehearing in banc that "[t]echnically" the Director could be deemed to have waived an argument against transfer based on Krecota. See Director, Office of Workers' Compensation Programs v. North American Coal Corp., 626 F.2d 1137, 1143 (3d Cir.1980).
 We note that in their briefs in this court Helen and the Director suggest that Chadwick was erroneously decided. We agree. See Old Ben Coal Co. v. Luker, 826 F.2d 688, 693-98 (7th Cir.1987).
 
 
 [8]
 We also take note of Director, Office of Workers' Compensation Programs v. Quarto Mining Co., 901 F.2d 532 (6th Cir.1990), decided by a divided court. In Quarto, the claimant, who never filed the election card because he did not receive it, joined in a motion by the mine operator before the ALJ to have benefits liability transferred to the Fund under the provisions at issue in this case. Although the claimant never formally requested review of his Part B claim, the Quarto court held that the motion before the ALJ was tantamount to a formal request to Social Security that the Part B claim be reopened, that there was "good cause" for failure to request review, and that, without more, liability should be transferred to the Fund. We believe that Quarto holds little more than Luker and that both are inapposite in a case in which the claimant remained uninvolved in the transfer dispute
 We recognize that the opinion in Quarto contains dictum that is in conflict with the decision of this court in Krecota. In both Quarto and Krecota, the claimant had not received notice of his right to elect review of his denied Part B claim. In Krecota, we held that a lack of notice does not obviate the need for a claimant to elect review in order for liability to transfer. In Quarto, the Court of Appeals for the Sixth Circuit did not need to address the issue because the claimant had joined with the operator in seeking review. Nonetheless, as Judge Becker correctly notes, that court stated in dictum that in a case where the claimant has not received notice, the operator may elect review of the denied Part B claim. We have no occasion to comment on this aspect of Quarto since the issue there presented is not currently before us. We note, however, that our decision today, contrary to Judge Becker's suggestion, does not create a conflict with anything the Court of Appeals for the Sixth Circuit has said in dicta or otherwise. In this case, unlike in Quarto and Krecota, the claimant received notice of his right to elect review of his denied Part B claim.
 
 
 [1]
 Helen Mining has suffered an injury in fact, to wit, potential liability for Burnsworth's benefits. That injury, moreover, is directly traceable to the Benefits Review Board's unwillingness to allow the administrative law judge's good cause finding, previously noted by the majority, to excuse Burnsworth's failure to request review of his Part B claim. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (emphasizing that a plaintiff, in order to have standing, must, inter alia, "allege a distinct and palpable injury to himself"); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasizing same); see also Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (generally discussing standing requirements, including requirement of "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief")
 In my view, the prudential standing requirements articulated in Warth were not intended to bar suits, such as this one, in which a party is threatened with financial liability despite a statutory exception that would relieve it of financial responsibility. I believe, moreover, that this case is analogous to Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), which the Warth Court distinguished in its application of prudential standing requirements. See Warth, 422 U.S. at 512-14, 95 S.Ct. at 2212-13. This case, like Trafficante, involves the assertion of a statutory right, and "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of [a] statute." Id. at 514, 95 S.Ct. at 2213.
 Further, as the majority suggests, Congress's intent to give Helen Mining standing to challenge the decisions of the administrative law judge and the Benefits Review Board can be inferred not only from the underlying statute, but also from the Administrative Procedure Act's provision that " 'a person suffering legal wrong because of agency action ... is entitled to judicial review thereof.' " Chrysler Corp. v. Brown, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979) (quoting Sec. 10(a) of the Administrative Procedure Act, 5 U.S.C. Sec. 702). See generally 4 K.C. Davis, Administrative Law Treatise Sec. 24.3 (2d ed. 1983); H. Hart & H. Wechsler, The Federal Courts and the Federal System 166-75 (P. Bator, D. Meltzer, P. Mishkin & D. Shapiro 3d ed. 1988).
 
 
 [2]
 I find nothing, moreover, in the SSA regulation that fleshes out the "good cause" requirement in the other election regulations that contradicts my conclusion that the language of these regulations is more indeterminate than it seems to the majority. This definitional regulation reiterates the rule that "[i]f a request for review ... is not received by the Social Security Administration within six months from the date the notice is mailed, the claimant shall be considered to have waived the right of review ... unless 'good cause' can be established for not responding within this time period." 20 C.F.R. Sec. 410.704(d) (1990). This regulation further provides that good cause for failing to request review in a timely manner may be established under the following circumstances:
 (1) Circumstances beyond the individual's control, such as extended illness, mental or physical incapacity, or communication difficulties; or
 (2) Incorrect or incomplete information furnished the individual by the Social Security Administration; or
 (3) Unusual or unavoidable circumstances, the nature of which demonstrate that the individual could not reasonably be expected to have been aware of the need to respond within this time period.
 Id.
 As I have stated, I do not believe that the rule reiterated in this regulation necessarily implies that good cause, if established, functions solely to extend the period in which a claimant personally may exercise the right to have a Part B claim reviewed. I also find nothing in the enumerated circumstances that this regulation states may give rise to good cause that suggests, as the majority asserts, that a claim may transfer to the Fund only at a claimant's personal behest.
 
 
 [3]
 The DOL originally drafted the provision defining "claim denied" to allow itself considerable latitude in determining which of the numerous claims rejected prior to the 1977 Reform Act were to be certified as claims "denied," and therefore eligible for transfer, as opposed to "closed because of abandonment." Proposed Bill to Amend the Black Lung Benefits Revenue Act of 1977 (unreported), Brief for Appellant, Appendix A, at 6; see also Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, 97th Cong., 1st Sess., Report and Recommendations on Black Lung Disability Trust Fund (Comm. Print 1981) at 25 (generally discussing DOL's proposal for the black lung program). This proposed definitional provision evidently proved unacceptable to the mine operators, their insurers, and labor, because it accorded the DOL too much discretion in deciding which claims could be transferred to the Fund. The provision in the bill that eventually became law gives the DOL considerably less power to prevent the transfer of certain claims. See 30 U.S.C. Sec. 902(i)(2)
 
 
 [4]
 This Report refers to the mine operators' and insurers' responsibility for making payments to beneficiaries whose last coal mine employment occurred between January 1, 1970, and June 30, 1973. In the legislation eventually enacted, of course, the unanticipated liabilities of which mine operators (and their insurers) were relieved include liabilities arising from claims denied prior to March 1, 1978, that have been or are approved under the 1977 Reform Act's liberalized criteria. See 30 U.S.C. Sec. 932(c)
 
 
 [5]
 There is very little likelihood that, had Burnsworth elected review of his denied Part B claim, this claim would again have been denied by the SSA. There is no evidence to suggest that the SSA was any more stringent than the DOL, which granted Burnsworth's Part C claim, in reviewing claims previously denied. See Report on the Fund, supra, at 20-22 (discussing high approval rate by both the DOL and the SSA of claims reviewed under the liberal criteria of the 1977 Reform Act). Indeed, there is some evidence to suggest that the SSA may have been more liberal than the DOL in granting claims previously denied. See Comptroller General of the United States, Report to Congress: Legislation Allows Black Lung Benefits to be Awarded Without Adequate Evidence on Disability 8 (1980) (evidence was not sufficient to establish disability or death from black lung in 88.5% of cases in which the SSA awarded benefits under liberalized standards of the 1977 Reform Act)
 
 
 [6]
 In drafting the regulation that implements the 1981 transfer provisions, 20 C.F.R. Sec. 725.496(d), the DOL looked to the requirement in the 1977 Reform Act, 30 U.S.C. Sec. 945(a)(1), that a claimant request review of a previously denied Part B claim. See 48 Fed.Reg. 24,283-84 (1983). The DOL, rejecting an "automatic review" theory under which any previously denied Part B claim might transfer to the Fund, concluded that this requirement (and its implementing regulations) should be incorporated into the regulation detailing the types of claims that may transfer to the Fund. See id
 
 
 [7]
 The SSA regulation that fleshes out the "good cause" requirement, 20 C.F.R. Sec. 410.704, provides that " '[g]ood cause' for failure to respond timely does not exist when there is evidence of record that the individual was informed that he or she should respond timely and the individual failed to do so because of negligence or intent not to respond." Under this regulation, it is entirely possible that good cause could not be shown for the failure of a duplicate claimant, such as Burnsworth, to request the review of a Part B claim in a timely manner. Had Burnsworth conferred with his attorney concerning the separate Part B and Part C notifications, for example, the ALJ might have found that Burnsworth knew that he should timely respond to the election notice for his Part B claim and have determined, pursuant to this regulation, that good cause did not exist for Burnsworth's failure to elect review of his claim
 
 
 [8]
 The DOL strenuously contended that permitting transfer in this case would contravene Congress's intent to limit the number of benefit claims transferred to the Fund. The DOL pointed out that Congress was concerned about the increased liability with which the 1981 Amendments might burden the Fund and therefore requested estimates of the number of claims that would transfer under this legislation. The DOL estimated that 10,200 claims would transfer--a significantly smaller number than the total number of claims technically eligible. See Report on the Fund, supra, at 27; 127 Cong.Rec. 31,510-11. Based on these estimates, the DOL argued that it was the intent of Congress to transfer 10,200 claims and only 10,200 claims--and therefore that mine operators may not effect transfers of claims such as Burnsworth's
 Although I do not dispute that Congress was concerned that the Fund not be burdened with undue liabilities and certainly did not intend to eliminate operator liability, I am unconvinced by this "numbers" argument. It proves too much.
 If the DOL's argument were accepted in its distilled form, it would compel the holding that Congress intended to transfer 10,200 claims and absolutely no more than that. If Congress had been concerned with nothing more than limiting the cost of the program to 10,200 claims, however, it could simply have estimated the cost of the 10,200 claims and instructed the Fund, through a formula, to reimburse mine operators directly. It also could have provided for transfer of the first eligible 10,200 review claims and denied all subsequent transfer requests. Either of these systems would have avoided the numerous problems attendant upon transferability lawsuits such as this one. Congress enacted neither of these options, presumably because it was less concerned with the Fund's liabilities than with affording relief to operators saddled with unanticipated liabilities and claimants entitled to relief. Congress may mistakenly have concluded that the Fund's transfer liability would somehow be limited to 10,200 claims. If so, however, this strikes me as a misapprehension with which Congress and the administrative agencies that execute Congress's laws must live.
 
 
 [9]
 The majority reasons that Quarto's holding is not significantly at variance from its own, and that its opinion therefore does not mark a circuit split, because: (1) the miner in Quarto joined with the operator in seeking the transfer of his claim to the Fund; and (2) whereas the claimant in this case received notice of his right to elect review of his denied Part B claim, the claimant in Quarto did not. Majority Op. at 1277 n. 8
 With regard to the majority's first grounds for distinguishing Quarto, the Sixth Circuit, as I have noted, framed its holding specifically to pronounce that, in the event that a claimant has failed to receive an election card, "the operator's raising of the transfer liability issue at a formal disability hearing suffices as a legitimate filing of a Part B claim." 901 F.2d at 537. Because, as the majority emphasizes, the miner joined with the operator in Quarto in seeking the transfer of his claim, the Sixth Circuit could have avoided the issue whether the operator's raising of the transfer liability issue would suffice as a legitimate filing of a Part B claim. The Sixth Circuit, however, plainly chose not to avoid this issue and clearly prefaced its conclusion that the operator's raising of the transfer issue would suffice as a legitimate filing with the words "[w]e hold." Id. at 537. In contrast to the majority, therefore, I do not conclude that the Sixth Circuit's resolution of this issue constitutes dicta.
 Further, I believe that the majority errs in concluding that the absence of notice to the Quarto claimant creates a material factual distinction between that case and this one. The importance of the absence of notice in Quarto is that, like the confusion created by the seemingly conflicting notices that Burnsworth received, it gave rise to good cause for the claimant's failure timely to elect review of his Part B claim. See id. at 534. I do not read Quarto to imply that, should an ALJ find that grounds other than an absence of notice supported a finding of good cause, the operator's raising of these grounds at a formal disability hearing would for some reason not suffice as the legitimate filing of a Part B claim.